379 A.2d 1313

In re NOVEMBER, 1975 SPECIAL INVESTIGATING
GRAND JURY.

Appeal of James T. O'BRIEN.

Supreme Court of Pennsylvania.

Argued April 2, 1976.

Decided Oct. 28, 1977.

Rehearing Denied Dec. 15, 1977.

126

Alan J. Davis, Howard Gittis, Philadelphia, for appellant.

Harry S. Tischler, Asst. Atty. Gen., for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## ORDER

PER CURIAM.

The Court being equally divided, the judgment of sentence is affirmed.

ROBERTS, J., files an opinion in support of affirmance in which O'BRIEN, J., joins.

POMEROY, J., files an opinion in support of affirmance in which O'BRIEN, J., joins.

NIX, J., files an opinion in support of reversal in which EAGEN, C. J., and MANDERINO, J., join.

JONES, former C. J., did not participate in the decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE

ROBERTS, Justice.

I

In January, 1974, a Special Investigating Grand Jury convened to investigate corrupt practices in the award of contracts, jobs and promotions by the City of Philadelphia and its agencies. One of the subjects of this inquiry was the acquisition and renovation of the residence of the Mayor of Philadelphia. In 1975, the Mayor and his accountant informed the Grand Jury that only representatives of Tracey Service Co., of which appellant is Custodian of Records, could supply answers to the Grand Jury's questions concerning the extent and source of funds for the improvements at the Mayor's address.

A subpoena was immediately issued for the relevant records in appellant's custody. Tracey Service Co. sought to avoid production, pursuing litigation over this issue which continued beyond the time of discharge of the 1974 Grand Jury. Upon the empanelment of the Special Investigating Grand Jury of November Term, 1975, an identical subpoena, identified as Subpoena Duces Tecum No. 27, was issued on December 30, 1975, to Tracey Service Co. On January 6, 1976, Tracey Service Co. filed with the supervising court a motion to quash Subpoena No. 27. In an opinion dated March 9, 1976, the court after thorough consideration of the grounds raised in the motion to quash held that all the contentions were without merit and ordered appellant to appear before the Grand Jury with the subpoenaed documents.

Appellant appeared before the court on March 10, 1976, and was granted a continuance for appearance until March 15, 1976. On March 15, 1976, appellant appeared before the Grand Jury but refused to testify or to produce the subpoenaed documents as ordered by the court, raising as justification the same grounds rejected by the supervising court less than a week earlier.

Later in the morning of March 15, 1976, appellant was brought before the supervising court, which again ordered him to produce the documents. When appellant persisted in his refusal to comply, the court solicited argument from the Commonwealth and appellant's counsel on whether appellant should be held in contempt, and if so, whether civil or criminal contempt should be imposed. The court then cited appellant for contempt, setting a hearing for the afternoon of the same day to determine sentencing. At the hearing, the court imposed a sentence of five months and 25 days, but later that day, Chief Justice Jones stayed the order of contempt pending resolution of appellant's appeal to this Court.

The 1975 Grand Jury has since been discharged without ever having seen the subpoenaed records. Thus, appellant's

refusal to produce the subpoenaed documents has frustrated two Grand Juries in the performance of their duties.

## II

The mere refusal to testify before a grand jury constitutes contempt. *In re Martorano*, 464 Pa. 66, 77, 346 A.2d 22, 27–28 (1975); cf. *Commonwealth v. Crawford*, 466 Pa. 269, 273 n.7, 352 A.2d 52, 54 n.7 (1976) (criminal contempt imposed for refusal to testify at trial). Good faith does not justify contemptuous behavior. *Pennsylvania v. Local 542, International Union of Operating Engineers*, 552 F.2d 498, 508–09 (3d Cir. 1977). It is also settled that "a contemptuous refusal to testify before a grand jury may be dealt with either a criminal contempt, civil contempt, or both." *In re Martorano*, supra, 464 Pa. at 77, 346 A.2d at 27–28. I cannot agree with the opinion supporting reversal that the supervising court's choice of a criminal contempt sanction constituted an abuse of discretion.

Petitioner's refusal to produce the documents amounted to an obstruction of justice. Our cases and those of the federal courts have defined obstructions of the administration of justice as any acts which have delayed, frustrated, disrupted or interfered with a court supervised proceeding. *United States v. Wilson*, 421 U.S. 309, 316, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186 (1975); *Matter of Johnson*, 467 Pa. 552, 558, 359 A.2d 739, 742 (1976); *Tenenbaum v. Caplan*, 454 Pa. 1, 4, 309 A.2d 428, 430 (1973). Here, the supervising court found that the refusal to produce the documents had already prevented the 1974 Grand Jury from investigating the purchase and renovation of the Mayor's residence, had delayed by more than six months the 1975 Grand Jury investigation of the same events, and threatened to frustrate the entire inquiry into that matter. The court was fully justified in regarding this sequence of events as an obstruction of the administration of justice. *United States v. Wilson*, supra at 316, 95 S.Ct. at 1806 ("a contumacious refusal to answer not only frustrates the inquiry but can destroy a prosecution.").

Apparently conceding this much, the opinion supporting reversal insists that the supervising court erred in not resorting to civil contempt sanctions. Several considerations compel me to disagree.

■■ To reach its conclusion that criminal contempt was unjustified, opinion supported reversal relies on the doctrine that a court must exercise the least possible power adequate to accomplish the desired end. *Shillitani v. United States*, 384 U.S. 367, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *In re Martorano*, supra. However, this principle does not require that a court engage in a futile act. Neither *Shillitani* nor *Martorano* commands that a court must initially impose civil contempt before resorting to criminal contempt sanctions. *Shillitani* and *Martorano* simply direct the court to impose criminal contempt only where civil sanctions would be inadequate or inappropriate. *Shillitani v. United States*, supra at 371 n.9, 86 S.Ct. at 1536 n.9; *In re Martorano*, supra 464 Pa. at 81 n.20, 346 A.2d at 29 n.20.[1] Civil contempt here would have been an insufficient remedy.

The court warned appellant that she would cite him for contempt if he persisted in his non-compliance with Subpoena No. 27. Appellant showed no signs of softening his stance. For more than six months, appellant had been pursuing a policy of non-compliance and had expressly in-

1. We have never held that the supervising court must articulate reasons why civil contempt sanctions have been found wanting. Although there may be forceful reasons for adopting such a requirement, cf. *Commonwealth v. Riggins*, 474 Pa. 115, 377 A.2d 140 (1977) (plurality opinion) (statement of reasons required for judge's choice of sentence), we have not yet done so. Thus far, courts in this Commonwealth satisfy *Shillitani* and *Martorano* simply by giving first consideration to civil contempt. Assuming, without deciding, that we should here embrace a rule such as we developed in *Riggins*, the statement of reasons offered by the supervising court in her opinion in support of the imposition of criminal contempt would more than satisfy that requirement.

Further, even if the supervising court had improperly failed to articulate reasons for resorting to criminal contempt, the error would not support a reversal of the court's contempt order. In that situation, the proper disposition would be to vacate and remand for imposition of contempt accompanied by a statement of reasons for the penalty imposed. *Commonwealth v. Riggins*, supra.

formed the court that he would not come forth with the records until appellate review had conclusively determined the legal merits of the arguments against production which he had presented in his motion to quash. In these circumstances, the court's conclusion that the imposition of coercive sanctions would be a futile gesture was definitely not an arbitrary one.

In support of her decision, the supervising court properly took notice of the limited duration of the Grand Jury and the relatively short statutes of limitations of the suspected crimes being investigated.[2] With respect to the first consideration, had appellant received a civil contempt penalty, he no doubt would have appealed, as he did upon receiving a citation for criminal contempt. Civil contempt sentences may not exceed the life of the Grand Jury, *In re Martorano*, supra 464 Pa. at 84, 346 A.2d at 31. Appellant's appeal of his civil contempt would most likely outlive the 1975 Grand Jury.[3] Thus, if appellant obtained a stay of the

2. The opinion supporting reversal criticizes the supervising court for not identifying with greater specificity the statutes of limitations which she feared would run before the requested documents would be provided. However, the court did list some of the crimes involved and the statutes of limitations about which she was concerned, singling out bribery (two year statute of limitations), extortion (two years), and offenses by public officers in connection with their offices (within two years of leaving office but not to extend more than three years).

 Given that the Grand Jury investigation began in January, 1974, and the first subpoena for the documents in appellant's custody was issued in the fall of 1975, it is clear that in March, 1976, there existed a serious danger that these statutes of limitations would run if compliance with the subpoena was delayed any longer. Indeed, it is probable that by now some of these statutes have run.

 Moreover, if the opinion supporting reversal is requiring that the supervising court specify the exact dates on which the crimes were committed, I must emphatically disagree.

3. Declaring that this Court is aware of the urgency of grand jury investigations, the opinion supporting reversal holds that it was improper for the supervising court to consider the delay occasioned by an appeal of a civil contempt order. While appellant managed to obtain a stay the very day on which contempt was imposed, this appeal is decided only after the passage of more than eighteen months. When the contemnor refuses to comply with the court's order until after a final decision on his appeal has been rendered, I

civil contempt penalty, which he in all likelihood would have sought, he would then escape both production and the coercive sanction designed to induce him to come forth with the documents. In short, a civil remedy would not have proved coercive at all.

■ The statutes of limitations of the suspected crimes being investigated are also relevant. First, the short duration of those periods in which indictments could be issued magnified the degree to which appellant's disobedience to the court constituted an obstruction of the administration of justice. Second, one Grand Jury had already terminated without production of the documents sought. Had the current Grand Jury also been discharged before compliance with Subpoena No. 27, the statutes of limitations for whatever crimes the documents might have revealed would most likely have run. When it is clear, as here, that a custodian of subpoenaed records will not produce them, whatever the sanction, until after resolution of an appeal, and compliance after such an appeal may well be too late to aid the Grand Jury in its investigation, the remedy of civil contempt is obviously inadequate.

■ The supervising court legitimately took account of these considerations in rejecting recourse to civil contempt; the subsequent history of this case confirms the court's fears that appellant would avoid punishment for his contemptuous conduct and frustrate the Grand Jury's investigation. Indeed, more than a year and a half has been required for this Court to issue a judgment on the contempt sentence. In that time, the 1975 Grand Jury has been discharged and with it has gone the foundation for any civil contempt sentence the court might have imposed. These very relevant considerations, confirmed by subsequent events, are within the realm of facts properly to be weighed by the

fail to see why the supervising court may not consider the delay appellate review will create. It is disingenuous to chastise the supervising court for entertaining concern that this Court would not decide the appeal during the term of the Grand Jury, when in fact we have failed to do so.

supervising court in determining whether civil contempt sanctions would be effective.

 Moreover, I reject the assumption that the only purpose of contempt is to coerce compliance with directions of a court. *In re Martorano, supra* 464 Pa. at 78, 346 A.2d at 28. Regardless of the utility civil sanctions might have had here, they are wholly inappropriate where the aim of the supervising court in citing for contempt is not to coerce, but to vindicate the authority of the court. At the contempt hearing, and again in her supporting opinion, the court plainly stated that she was acting to uphold her authority.[4] We do not serve the ends of justice by prescribing in such a situation the use of civil contempt remedies, whose purpose is primarily for coercing compliance with court orders, to the exclusion of criminal penalties which are specifically designed for punishing disobedience to the court. See *In re Martorano, supra* 464 Pa. at 78, 346 A.2d at 28.

The opinion supporting reversal finds in the court's resort to criminal contempt a threat to the entire scheme of civil contempt as a remedy for supervising grand jury investigations. To the contrary, the court properly exercised her discretion in choosing among the various contempt remedies available to serve her particular purpose. See *United States v. Wilson, supra* at 316–17, 95 S.Ct. at 1807 (use of various contempt remedies lies in discretion of court). Appellant's mere non-compliance with the court's order justified the imposition of criminal contempt. *Pennsylvania v. Local 542, International Union of Operating Engineers, supra.* A contrary result would place in jeopardy the ability of a court to rely on criminal contempt to sustain its authority when challenged by contemptuous behavior.

 The opinion supporting reversal goes even further astray when it reasons that the court's order of contempt penalized access to the courts and the right of appeal. No

4. "[Appellant] has put himself above the authority of the Court. The course of conduct pursued by the witness represents a substantial interference with the authority, dignity and administration of justice."

authority is cited for this proposition. Appellant received his contempt sentence not because he had voiced his intention to appeal his citation of contempt, but solely because he had flouted court orders directing him to comply with Subpoena No. 27. I must repeat that good faith establishes no defense to contempt, *Pennsylvania v. Local 542, International Union of Operating Engineers, supra.* The right to appeal is perverted when it operates to place a contemnor pursuing an appeal, whatever its merits,[5] in a better position than one who yields to the court's judgment. This logic in effect immunizes from criminal contempt all contemnors who plan to appeal their sentences. The right to appeal assures the opportunity to obtain review of the judgment imposed; it does not require that a contemnor, simply by announcing his determination to appeal, is entitled to a different kind of sanction than another individual would receive for the same conduct.

If anything, the course advocated by the opinion supporting reversal, imposition of civil sanctions while an appeal is pending, represents a greater burden on the right to appeal than does judgment of criminal contempt.[6] Civil contempt is designed to force compliance with court orders. If the civil sanctions are successful in coercing compliance, they will deny a contemnor the right to appeal because compliance renders moot the underlying issue. In any event, I do not understand how appellant's criminal sentence can be

5. It is well to remember that the supervising court, in her opinion in support of the judgment of contempt, described appellant's arguments against compliance as "without substance and frivolous."

6. According to the opinion supporting reversal, the supervising court should have imposed civil contempt and refused to grant a stay of the contempt, deferring to this Court the determination of whether a stay was proper. This procedure would compel us to decide whether to grant a stay before we determined the merits of the appeal. Consequently, we would face a dual-pronged risk: grant of a stay could allow an appellant deserving of contempt to escape sentence altogether, while failure to grant could relegate to confinement an individual with a meritorious appeal. On the other hand, following a judgment of criminal contempt, we can stay the judgment, cognizant that the guilty will be punished if we affirm an appeal, and the innocent will not have served any sentence if we reverse.

regarded as an "enhanced" penalty when it was approximately six months shorter than the confinement appellant might have faced under a civil contempt.

Of course, we should encourage courts to use the least possible power to secure the end proposed; but this case does not present us with an example of power excessively administered. The supervising court performed its functions in a responsible manner in ordering criminal contempt. We should affirm.

O'BRIEN, J., joins in this opinion.

## OPINION IN SUPPORT OF AFFIRMANCE

POMEROY, Justice.

In 1975 a special grand jury was convened in order to investigate alleged improprieties in the conduct of business by the City of Philadelphia. Appellant, James T. O'Brien, was ordered to produce certain records pertaining to construction work performed on the residence of the mayor of Philadelphia. In the presence of the judge charged with the responsibility of supervising the work of the grand jury, Mr. O'Brien repeatedly and deliberately refused to comply with that court's directives. The presiding judge (Marshall, J.) thereupon adjudged the appellant guilty of criminal contempt and ordered him confined.[1] The opinion in support of reversal recognizes that O'Brien's behavior in open court was contemptuous of the court but concludes that in finding criminal contempt, the court abused its discretion. I cannot agree.

The power of Pennsylvania courts to summarily impose criminal contempt is clear and unambiguous. *McMillian v. Mountain Laurel Racing, Inc.*, 467 Pa. 266, 356 A.2d 742 (1976); *Commonwealth v. Patterson*, 452 Pa. 457, 308 A.2d 90 (1973); *Altemose C. Co. v. B & C. T. Council of*

---

1. The sentence imposed was five months and twenty-five days. The sentence being less than six months in duration, there is no right to a jury trial. See *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974).

*Phila.*, 449 Pa. 194, 296 A.2d 504 (1972) (Opinion in Support of Affirmance). This has been part of the statutory law of this Commonwealth for 140 years.

The Act of 1836 provides:

"The power of the several courts of this commonwealth to issue attachments and to inflict summary punishments for contempts of court shall be restricted to the following cases, to-wit:

 I. To the official misconduct of the officers of such courts respectively;

 II. To disobedience or neglect by officers, parties, jurors or witnesses or to the lawful process of the court;

 III. To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice. 1836, June 16, P.L. 784, § 23," 17 P.S. § 2041.

Despite the fact that the conduct here involved was "disobedient . . . to the lawful process of the court" and occurred "in the presence of the court, thereby obstructing the administration of justice" the opinion in support of reversal finds the imposition of criminal contempt improper.

The basis of the holding in Mr. Justice Nix's opinion is the statement first expressed, so far as we know, in a footnote in the opinion of the Supreme Court of the United States in *Shillitani v. United States*, 384 U.S. 364, 371 n. 9, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622, 628, n. 9 (1966). The Court there stated:

"[T]he trial judge [should] first consider the feasibility of coercing testimony through the imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate." 384 U.S. at 371 n. 9, 86 S.Ct. at 1536 n. 9.

I too believe that the *Shillitani* footnote expresses a wise admonition, but I cannot agree that it sets forth a hard and fast rule which always requires that civil contempt be im-

posed in the first instance.[2] Rather, the Supreme Court seems to me to be indicating only that the least coercive remedy sufficient to accomplish the goals of the court should be chosen. In the case of *In Re Martorano*, 464 Pa. 66, 346 A.2d 22 (1975), this Court noted the rule in *Shillitani* was one of discretion:

> "We can perceive no reason why this was an improper judicial response to Martorano's contempt. The act sought to be coerced, testimony before the grand jury, was capable of being performed prospectively. In no event was imprisonment to extend beyond the term of the grand jury. *The court wisely exercised its discretion to attempt to coerce compliance before imposing punishment for noncompliance.* See *Shillitani v. United States, supra.* We conclude that the court's civil-contempt response to Martorano's contempt was within its inherent power to compel obedience to its order and was consistent with the nature and limitations of civil contempt. Martorano's argument to the contrary must be rejected." 464 Pa. at 81, 346 A.2d at 29–30 (emphasis added) (the omitted footnote contains the passage from *Shillitani* quoted above).

Thus, assuming that the rule in *Shillitani* is here applicable,[3] our inquiry should end once it is established that the supervising court considered lesser alternate sanctions but for "good reason" rejected them.

　　　 From the record in the instant case, it is clear that the trial court was seeking to vindicate its authority; a finding of criminal contempt was thus clearly appropriate.

**2.** Neither do I believe that this utterance by the Supreme Court is a constitutional pronouncement or that it is binding on this Court; it is but persuasive authority which we may follow if we are so inclined. I do not understand the opinion of Mr. Justice Nix to say otherwise.

**3.** The above noted reference to *Shillitani* (the only such reference in the *Martorano* opinion) is hardly a sound basis for the conclusion of Mr. Justice Nix that *Martorano* made the *Shillitani* rule "applicable to the courts of this jurisdiction." At best, *Martorano* could be read as this Court's acknowledgment that the trial court had authority to impose civil contempt even though criminal contempt might also have been as appropriate.

Before issuing its contempt judgment, however, the supervising trial judge stated:

"I asked Mr. O'Brien if he was still going to proceed not to produce the records which he was directed to bring as custodian of records of a corporation and he advised that he still is proceeding under that same refusal. It seems to me that he is violating the dignity of the authority of the Court to protect in the interest of the public and I view the dominant purpose as one of punishment. It has been ruled on and he was directed to come and give testimony and bring records and he has invoked the Fifth Amendment to which he is not entitled, and this matter has been before one Grand Jury which has gone out of existence without hearing from the witness involved and not obtaining the records. It is not the intention of this Court to let the matter languish for another eighteen months.

"I don't think that giving him the privilege of giving him the keys of the cell room are going to do anything toward moving him to come in and give testimony. He has been given an opportunity and declined to take the opportunity, and I am, under all circumstances, in my position, feel that the dignity of the Court has been challenged and I am finding him in criminal contempt."

The lower court was convinced that O'Brien, however long importuned, would continue to refuse to respond to the grand jury interrogation.[4] Given this situation, a finding of civil contempt, which is designed only to coerce *compliance*, would have been ineffectual.[5] Hence the trial judge was justified in concluding that a finding of criminal contempt was the only proper means whereby its authority could be vindicated.

---

**4.** The history of these grand jury proceedings as well as the appellant's own statements would, I believe, support such a conclusion.

**5.** The opinion in support of reversal overlooks the fact that a civil contempt order which places the "keys to the jail" in the appellant's pocket in effect permits the contemnor to continue to affront the dignity of the court for as long as he chooses to refuse compliance. Thus, despite the fact that civil contempt might also result in incarceration, it does not, as criminal contempt, vindicate the court's authority.

▮ Furthermore, because Mr. O'Brien adamantly adhered to his position of non-response, had the trial court ordered incarceration until such time as the appellant altered his position it is quite possible that O'Brien would have remained in jail until the remaining 11 months of the grand jury term expired. This being so, it can hardly be said that the imposition of a fixed jail term of 5 months and 25 days was too severe under the circumstances.

▮ In sum, I would defer in this case to the discretion of the supervising court. That court concluded, in my opinion appropriately, that criminal contempt was the most effective sanction whereby the court's objectives could be accomplished; in the particular circumstances here present, it was also the least severe. There was no violation of the admonition in the *Shillitani* footnote. Hence I would affirm the judgment of sentence.

O'BRIEN, J., joins in this opinion.

## OPINION IN SUPPORT OF REVERSAL

NIX, Justice.

The instant appeal raises the interesting question as to the constraint on a court in imposing a penal sanction for a direct criminal contempt where under the facts of the case the less drastic remedy of civil contempt was equally available to exact the desired compliance with the court's order. For the reasons set forth hereinafter I am of the view that the court's resorting to its powers of direct criminal contempt was an abuse of discretion and therefore, I would reverse the judgment of sentence imposed thereunder.

The background of this appeal is that on December 29, 1975, a subpoena duces tecum was issued on behalf of the November, 1975, Special Investigating Grand Jury of Philadelphia to appellant who is custodian of records of Tracey Services Corporation of Philadelphia. This subpoena directed the appellant to appear before the special investigating grand jury and to bring with him certain corporate docu-

ments and records pertaining to the purchase and renovation of the Mayor of Philadelphia's personal residence. Tracey Services Corporation thereupon filed a motion to quash the subpoena on various grounds. This motion was denied by the supervising judge of the grand jury on January 17, 1976, and appellant was ordered to appear as a witness before the grand jury with the subpoenaed records. Thereupon Tracey Services Corporation petitioned the court below for allowance of an appeal to the Superior Court pursuant to the Act of 1970, July 31, P.L. 673, No. 223 art. V, § 501, 17 P.S. 211.501 (Supp.1977–78). The request for certification was denied and appellant was once again ordered to present himself and to produce the documents in question.

On March 15, 1976, appellant appeared and was sworn as a witness but declined to produce the subpoenaed records. As a consequence, he was taken before the supervising judge who directly ordered him to honor the subpoena. When he refused, the court, in the presence of appellant's attorney, held appellant in direct criminal contempt. Later that afternoon appellant was sentenced to an unconditional jail term of five months and twenty-five days. This direct appeal followed.[1]

In this jurisdiction we have long recognized the inherent power in our courts to enforce their orders and decrees by imposing penalties and sanctions for the failure to comply therewith. *Brocker v. Brocker*, 429 Pa. 513, 519, 241 A.2d 336, 340 (1968); *Commonwealth ex rel. Beghian v. Beghian*, 408 Pa. 408, 413–14, 184 A.2d 270, 271 (1962); *Knaus v. Knaus*, 387 Pa. 370, 122 A.2d 669 (1956); *Commonwealth ex rel. v. Perkins*, 124 Pa. 36, 16 A. 525 (1889). The power of contempt has been classified as civil and criminal. Criminal contempt has been further subdivided into direct and indirect contempts.[2]

1. Jurisdiction of this appeal is founded on the Act of 1970, July 31, P.L. 673, No. 223, Art. II, § 202(5), 17 P.S. § 211.202(5) (Supp.1977–78).

2. The distinction between a direct criminal contempt and an indirect criminal contempt is that in direct criminal contempt the contuma-

This Court has recently explicated the distinction between criminal and civil contempt as being dependent upon the *dominant purpose* of the Court in entering its adjudication.

There is nothing inherent in a contemptuous act or refusal to act which classifies that act as "criminal" or "civil." The distinction between criminal and civil contempt is rather a distinction between two permissible judicial responses to contumacious behavior. For example, it is clear that a contemptuous refusal to testify before a grand jury may be dealt with either a criminal contempt, civil contempt, or both.

These judicial responses are classified according to the dominant purpose of the court. If the dominant purpose is to prospectively coerce the contemnor to comply with an order of the court, the adjudication of contempt is civil. If, however, the dominant purpose is to punish the contemnor for disobedience of the court's order or some other contemptuous act, the adjudication of contempt is criminal.

Dominant purpose of coercion or punishment is expressed in the sanction imposed. A civil adjudication of contempt coerces with a conditional or indeterminate sentence of which the contemnor may relieve himself by obeying the court's order, while a criminal adjudication of contempt punishes with a certain term of imprisonment or a fine which the contemnor is powerless to escape by compliance. See *Shillitani v. United States,* 384 U.S. 364, 368–70, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966); *Riccobene Appeal,* supra, 439 Pa. [404] at 421–23, 268 A.2d [104] at 113–14; *Knaus v. Knaus,* 387 Pa. 370, 379, 127 A.2d 669, 673 (1956); D. Dobbs, Handbook on the Law of Remedies § 2.9, at 97 (1973); Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 235–39 (1971). *In re*

cious conduct occurs "in the presence of the court, or so near thereto to interfere with its immediate business." *Commonwealth v. Patterson,* 452 Pa. 457, 461, 308 A.2d 90, 92 (1973). *See also Philadelphia Marine Trade Association v. International Longshoreman's Association,* 392 Pa. 500, 140 A.2d 814 (1958); *Knaus v. Knaus,* 387 Pa. 370, 122 A.2d 669 (1956).

*Martorano*, 464 Pa. 66, 77–78, 346 A.2d 22, 27–29 (1975) (footnotes omitted).

*See also Woods v. Dunlop*, 461 Pa. 35, n. 2 at 40, 334 A.2d 619, n. 2 at 622 (1975).

The difficulty in differentiating civil and criminal contempt arises not only because the dividing line between the two is ofttimes shadowy or obscure, but also because the same facts or conduct may constitute or amount to both civil and criminal contempt. *Brocker v. Brocker, supra.* Fortunately, in the instant case the court made it eminently clear that her dominant purpose was to vindicate the dignity and authority of the court; in conformity therewith she sentenced appellant to an unconditional jail term. Thus, there is no difficulty in determining that what was intended by the court in making its adjudication was a finding of a direct criminal contempt. The problem, however, is occasioned by the fact that the alleged contumacious conduct could have also constituted a civil contempt; thus we are called upon to determine whether it was a proper exercise of discretion to elect to impose the more drastic response when the remedy of civil contempt was equally available.

The United States Supreme Court has directed that judges in the federal system in cases of recalcitrant witnesses should first consider the feasibility of coercing testimony through the imposition of civil contempt before resorting to criminal sanctions. *United States v. Wilson*, 421 U.S. 309, 328, n. 9, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975); *Shillitani v. United States*, 384 U.S. 364, 371, n. 9, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). The rationale underlying the rule is that a court must exercise the least possible power adequate to accomplish the desired end. *Shillitani v. United States, supra; In re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945); *Anderson v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 231, 5 L.Ed. 242 (1821). *See also Lambert v. State of Montana*, 545 F.2d 87 (9th Cir. 1976). To implement this rule federal judges are required to articulate good reasons why the civil remedy would be inappropriate in a given case before resorting to criminal sanctions. Since this rule was promulgated

under the supervisory power of the United States Supreme Court it is not binding upon state courts; however, this Court has expressed its agreement with the philosophy of this rule and made it applicable to the courts of this jurisdiction. *In re Martorano, supra,* 464 Pa. at 81, n. 20, 346 A.2d at 24, n. 20. I would reaffirm our statement in *Martorano* and stress that this principle is a viable restraint upon a trial court's exercise of its contempt power in this Commonwealth.

Prior to an examination of the court's justifications for imposing criminal contempt rather than civil contempt, certain basic concepts must be kept in mind. It should be remembered that the challenged conduct was simply the respectful refusal to produce the requested documents. This situation should be distinguished from instances where disobedience to a court order is exacerbated by insolence, insult or other types of disruptive conduct. I recognize that the refusal to obey a court order, even though accomplished in a respectful manner, is contemptuous behavior where the progress of the proceeding is disrupted and hence the orderly administration of justice affected. As noted by the United States Supreme Court the mere refusal to testify may be more damaging to the orderly administration of justice than violent disruptions during a trial.

The refusals were contemptuous of judicial authority because they were intentional obstructions of court proceedings that literally disrupted the progress of the trial and hence the orderly administration of justice. *Yates v. United States,* 227 F.2d 844 (CA9 1955). Respondents' contumacious silence, after a valid grant of immunity followed by an explicit, unambiguous order to testify, impeded the due course of Anderson's trial perhaps more so than violent conduct in the courtroom. Violent disruptions can be cured swiftly by bodily removing the offender from the courtroom, or by physical restraints, *Illinois v. Allen,* [397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353] supra; see *Ex parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888), and the trial may proceed. But as this case demon-

strates, a contumacious refusal to answer not only frustrates the inquiry but can destroy a prosecution. Here it was a prosecution; the same kind of contumacious conduct could, in another setting, destroy a defendant's ability to establish a case. *United States v. Wilson, supra* 421 U.S. at 315–16, 95 S.Ct. at 1806 (footnote omitted). The issue here posited is not whether the behavior was contemptuous; rather, conceding the contumacious conduct, it must be determined whether the appropriate judicial response was employed.

Further, I recognize that the deliberate refusal to comply with the court order, in and of itself, constitutes an affront to the dignity of the court and requires a response that will vindicate the authority of the court. However, even though the principal thrust of civil contempt is remedial, since the gravamen of the affront to the court is the contumacious silence, a sanction designed to encourage compliance has the incidental effect of vindicating the court's authority. I believe that the offense to the interest of the general public in having the grand jury's investigation proceed in an orderly fashion would have been best rectified by the imposition of a coercive sanction designed to induce the production of the desired evidence rather than an unconditional sentence from which the appellant was powerless to purge himself. *Compare Shillitani v. United States, supra.* Absent circumstances which would have made it impossible to have fashioned an effective coercive remedy, there would be no basis for the election to reject the civil remedy.

The first stated consideration of the lower court for deciding that a remedial approach would be inappropriate was the observation that under the laws of this Commonwealth special investigating grand juries may not continue perpetually. *In re January 1974, Grand Jury,* 458 Pa. 586, 599, 328 A.2d 485, 491 (1974). *See also, Shenker v. Harr,* 332 Pa. 382, 2 A.2d 298 (1938).[3] While this fact is undoubtedly

---

**3.** This Court in considering the term of a regular indicting grand jury had occasion to observe: "A tendency to establish anything approaching permanency in a grand jury is repugnant to our scheme of

true, it fails to support the decision to ignore civil contempt in the instant case. At the time the adjudication of criminal contempt was made the grand jury had been convened for five months. Thereafter the grand jury continued its work for an additional eleven months. That eleven-month period provided ample time to have fashioned a coercive remedy which might have been effective in encouraging compliance. The instant factual situation is obviously distinguishable from where the contumacious conduct occurs when the discharge of the grand jury is imminent, thereby preventing the imposition of a conditional jail sentence which would allow adequate time to goad the appellant into honoring the subpoena.[4]

If one were to accept the view that the temporary nature of this type of an investigating body, in and of itself, is sufficient reason to impose criminal sanctions rather than to seek compliance through remedial measures, this would, in fact, virtually eliminate civil contempt as a remedy in the arsenal of courts in charge of such a grand jury. It would, also be ignoring the fact that while criminal sanctions may serve as a deterrent to future conduct of this type, their use in these instances is, nevertheless, an implicit admission that

government and subversive of individual rights." *Shenker v. Harr*, 332 Pa. 382, 388–89, 2 A.2d 298, 301 (1938).

**4.** A limitation on civil contempt sentences is that they may not exceed the term of the grand jury. *In re Martorano*, 464 Pa. 66, 84, 346 A.2d 22, 31 (1975); *Riccobene Appeal*, 439 Pa. 404, 268 A.2d 104 (1970). Nonetheless, the sentences of imprisonment may be continued or reimposed if the witness adheres to his refusal to testify before a successor grand jury. *Shillitani v. United States*, 384 U.S. 364, 371, n. 8, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1965). The basis for the proposition that a civil contempt sentence cannot extend beyond the life of the grand jury rests on the very nature of the sanction. "If the grand jury has been dissolved, however, there can be no coercive purpose in the contempt sentence, and the sentence must therefore be a determinate one; that being so, the procedure must be compatible by furnishing the criminal type protections." *In re Martorano, supra* 464 Pa. at 79–80, n. 17, 346 A.2d at 28–29, n. 17.

the court is unable to force an intractable witness to comply with its dictates.[5]

In a similar context the lower court's opinion suggests that the information sought to be obtained from this witness related to crimes which had short statutes of limitations. The hearing judge regrettably failed to supply sufficiently specific information to evaluate this reason. Without knowing exactly when the statutes for the suspected crimes would have run in relationship to the court's direction to testify, it is impossible to assess this basis. Further, it would appear that if the court had been concerned with securing the information in sufficient time to obtain an indictment prior to the causes of action being barred by the statute of limitations, the more feasible approach would have been to encourage the witness through civil contempt rather than by punishment which is impervious to the possibility of future compliance.

The court also expressed a concern over the litigation that had been engendered as the result of the issuance of the instant subpoena and commented upon the possibility of further delay during the course of appellate review.[6] Again I do not believe that these factors provide a legitimate basis

5. In concluding that the civil contempt sanction would have been a "futile gesture," Mr. Justice Roberts places considerable emphasis upon appellant's apparently firm resolve not to comply with the subpoena. At the same time, however, he correctly notes that in the instant case the civil penalty could have resulted in a sentence of imprisonment approximately six months longer than that of the criminal penalty which was imposed. Viewing this fact coupled with the conditional nature of the civil penalty, i. e., terminable by the appellant upon his compliance with the subpoena, it is difficult to accept the conclusion that coercive civil sanctions would have been a "futile gesture" and "obviously inadequate." What is apparent is that in this case the civil contempt penalty would have been a particularly appropriate method of coercing compliance *and* vindicating the dignity of the court. The very purpose the civil remedy is designed to achieve is to overcome the resolve of an intractable witness and to gain compliance.

6. The court in its opinion noted that an identical subpoena was issued by a prior special investigating grand jury and stimulated such litigation that the former jury was discharged prior to an ultimate determination of the legality of the issuance of the subpoena.

for opting for criminal punishment. The thrust of the lower court's reasoning is that the decision to impose punitive sanctions was justified either because of the prior delay or because of the possibility of subsequent delay due to appellate review. Considering first the extensive litigation which preceded the adjudication of contempt, it cannot be said that the issues raised were not substantial. Further, it has not been established that the appellant did not advance his contentions in good faith.[7] It would be repugnant to our jurisprudence to penalize a litigant for offering, in good faith, substantial claims in support of his or her position. I reiterate that the failure of a witness to respond to a lawful order of the court constitutes contumacious conduct. However, to enhance the penalty to be imposed because the contemnor seeks to test the validity of the grand jury subpoena or the court order to comply therewith would be punishing him for the exercise of his constitutionally protected right of access to the courts of this Commonwealth. Pa.Const. Art. 1, § 11.

Nor do I believe that the presiding judge properly considered further delays that might have been occasioned by the intervention of an appellate court.[8] At the time of the imposition of its sentence the trial judge had the election to refuse a request for a stay of the execution of that sentence pending appellate review. In fact, such a request was made and denied. Whether an appellate court, upon review, would subsequently deem it advisable to enter a supersedeas

7. In the lower court appellant challenged the validity of the convening of the special investigating grand jury, the supersession of the Special Prosecutor over the Philadelphia District Attorney, the charge of the court to the grand jury and the summary nature of the contempt proceeding.

8. The presiding judge intimated in her opinion that if a civil penalty had been imposed and a stay of proceedings allowed, the matter may not have been disposed of on appeal prior to the expiration of the grand jury, thereby frustrating the purpose of the sentence. This Court is aware of the urgency of these grand jury investigations and is presently considering rules to provide for the accelerated disposition of these matters on appeal. See e. g., The Supreme Court Advisory Committee on Appellate Court Rules, Recommendation No. 3 (Appellate Review of Special Prosecutions and Investigations.)

rests within that court's sound discretion and it cannot be presumed that the appellate court will abuse that discretion. Absent such a presumption it was improper for the presiding judge, in choosing between criminal and civil contempt, to anticipate the actions of a reviewing court.[9]

The procedural posture of cases of this type, in fact, is another reason supporting the wisdom of the "least possible power" doctrine as applied to recalcitrant witnesses. Under our law the witness can only secure appellate review of his objections by exposing himself to the court's power of contempt. *In re Petition of Arlen Specter,* 455 Pa. 518, 317 A.2d 286 (1974). To conclude that because the presiding judge does not deem the objections raised by the witness to be persuasive that a continued refusal to supply the requested information justifies the imposition of a criminal sanction places an intolerable strain upon the exercise of the constitutional right of appeal.[10] Thus, persistence in the refusal to

9. The opinion of Mr. Justice Roberts stresses the fact that a Stay of Proceedings was granted by this Court. He continues the argument imploring the use of hindsight to point to the fact that the term of the jury had in fact expired prior to the resolution of this case. From these facts, Mr. Justice Roberts concludes that the imposition of a civil sanction in the instant case would have been an exercise in futility. The weakness of this syllogism is readily apparent. First, this argument ignores the fact that an unconditional jail sentence had been imposed and that it was the execution of that sentence for which this Court granted the Stay of Execution. It does not follow that if a presiding judge had seen fit to impose a conditional sentence under its civil contempt powers that this Court would have responded in the same manner to appellant's request for a Stay.

Secondly, the fact that the resolution of this appeal would come at a time after the expiration of the term of the grand jury is something that the presiding judge could not have known as a fact at the time that the sentence was imposed. At best, she could only speculate as to the time that might be involved in subsequent appellate procedures. Mr. Justice Roberts further assumes that if a Stay had been granted to a conditional order of civil contempt that this Court would have taken the same time to resolve the issues. To the contrary, I suggest that it is much more likely that the conditional nature of the civil contempt remedy would have prompted this Court to give such a decision special priority and as a result would have expedited disposition of the case.

10. "§ 9. Right of appeal

There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal

testify after a rejection of the claims by the presiding judge, which is a condition precedent for appellate review, may not be considered a basis for an enhanced penalty absent aggravating circumstances such as a showing of dilatory tactics or patently frivolous claims.

In summary, I believe that where a witness has refused to testify or to produce specified documents, absent any other exacerbating or aggravating conduct, the gravamen of the contempt is the non-compliance and the appropriate response is civil contempt. In such situations judges should resort to the coercive remedies of civil contempt unless it can be shown that those remedies would not be appropriate in a given case. In the instant appeal I find that the court failed to articulate "good reasons" why the civil remedy was not utilized; contrary to the reasoning below, I would hold that the instant situation called for the imposition of coercive measures through civil contempt.

I would therefore reverse the judgment of sentence and since the term of the grand jury has expired, discharge the appellant.

EAGEN, C. J., and MANDERINO, J., join in this opinion.

JONES, former C. J., did not participate in the decision of this case.

from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law." Pa.Const. Art. 5, § 9.