### Boehler v. Boehler

C.P. of Lebanon County, No. 2006-20469

*Donna Long Brightbill*, for plaintiff.
*Melissa Montgomery*, for defendant.
*Wiley Parker*, guardian ad litem.

CHARLES, *J.*, Nov. 25, 2014—When the whims of children are frequently indulged, they will quickly get the message that "what I want" is most important. When a child's pique is permitted to prevail over adult rules, the child will be emboldened to employ drama as a tactic to get "what I want." When children are permitted to stubbornly disobey court-ordered custody schedules, the message conveyed is that "what I want" trumps even the rule of law. Given the above — which we classify as axiomatic to the point of being self-evident — it is imperative that parents do everything possible to prevent children from gaining control over custody disputes. Anything less is a recipe for disaster.

In this case, Jeffrey Boehler (hereafter "father") enjoys court-ordered custody rights with all three of his sons. Z.B.[1], the oldest boy, refuses to obey the custody schedule.

There are certainly many reasons that underlie Z.B.'s oppositional behavior. However, we conclude that the conduct and attitude of Beth Ann Boehler (hereafter "mother") has enabled and even engendered Z.B.'s defiance. Therefore, we will be finding mother in contempt of court today. The reasons for this decision will be articulated within the body of this opinion.

---

1. Because he is still a minor and because we will be referencing him with sometimes less than flattering language, we will refer to the parties' eldest son by his initials rather than his full name.

## I. PROCEDURAL BACKGROUND

This case has a painful and lengthy history. In the past eight years, this court has expended well over a thousand hours of time hearing and analyzing disputes between mother and father. The most contentious of these disputes involve custody of the parties' three children.

The most recent iteration of the parties' ongoing battle over custody rights involved a custody modification petition filed by father via which he alleged that mother had embarked on an intentional campaign to cause estrangement between himself and his children. While we gave credence to father's claim that a campaign of estrangement was employed against him, we retained mother as primary physical custodian due to the good daily care she provided for her children.

The decision we rendered regarding father's modification petition was appealed to the Pennsylvania Superior Court. While the Superior Court affirmed almost all of our decision, it did ask us to reevaluate the issue of legal custody. We conducted a hearing in May of 2014 to do just that. Following the hearing, we issued an opinion on August 5, 2014 that employed unusual relief; we provided mother with primary physical custody and father with primary legal custody. Mother appealed this decision. Her appeal is now pending before the Pennsylvania Superior Court.

On September 18, 2014, father filed a petition for contempt. In his petition, father alleged that he was not able to enjoy the court-ordered time he was awarded with his oldest son, Z.B. A hearing regarding father's motion for contempt was conducted on November 17, 2014. We issue this opinion in support of our decision to find mother in contempt of court.

## II. DISCUSSION RE: CONTEMPT

### A. Legal Principles

"Contempt is a generic concept distinguished by two types, criminal and civil contempt. The difference is not of the essence, but of the purpose sought by their use." *Warmkessel v. Heffner*, 17 A.3d 408 (Pa. Super. 2011). When the "dominant purpose" of the contempt is to "vindicate the dignity and authority of the court and to protect the interest of the general public," the contempt is deemed criminal. However, when the act of contempt primarily impacts a private party, proceedings to enforce compliance with the court order are civil in nature. *See Stahl v. Redcay*, 897 A.2d 478, 486 (Pa. Super. 2006). The remedy imposed in a civil contempt focuses upon compelling compliance with court orders while the focus of a criminal contempt is upon punishment of the contemnor. As noted by our Superior Court:

A civil adjudication of contempt coerces with conditional or indeterminate sentence of which the contemnor may relieve himself by obeying the court's order, while a criminal adjudication of contempt punishes with a certain term of imprisonment or a fine which the contemnor is powerless to escape by compliance.

*Schnabel Assoc. v. Building and Construction Trade Counsel*, 487 A.2d 1327, 1332 (Pa. Super. 1995).

Custody orders are enforced via a petition for civil contempt. *Brocker v. Brocker*, 241 A.2d 336 (Pa. 1968). As such, the purpose of a custody contempt order is remedial; judicial sanctions must either (1) coerce the defendant into compliance with the court's order, and/or (2) compensate the complainant for losses sustained." *Brocker, supra* at 340. In appropriate situations, attorney's fees and

"other disbursements necessitated by the contemnor's noncompliance" may be awarded as a sanction for contempt. *Wood v. Geisenhemer-Shaulis*, 827 A.2d 1204, 1207 (Pa. Super. 2003).

In determining whether a party can be found in civil contempt, the focus of the court must be upon whether a court order has been violated. "In civil contempt cases, the complaining party has the burden of proving noncompliance with the court order by a preponderance of evidence." *C.R. by Dunn v. Travelers*, 626 A.2d 588, 592 (Pa. Super. 1993). Generally speaking, "each Court is the exclusive judge of contempts against its process." *G.A. v. D.L.*, 72 A.3d 264, 269 (Pa. Super. 2013), quoting *Royal Bank of Pennsylvania v. Selig*, 644 A.2d 741, 747 (Pa. Super. 1994).

B. Noncompliance With Court Order

The custody order we entered on August 5, 2014 afforded mother with primary physical custody. Father was awarded only partial custody as follows:

(1) Alternating or divided holidays;

(2) Vacation time during the summer;

(3) Alternating weekends; and

(4) Non-overnight time on Wednesdays during the week.

In terms of physical custody, there was no question that most of the children's time would be spent with their mother in Wrightsville.

Although some problems existed with the parties' youngest two sons, the primary focus of the contempt petition has been upon Z.B. Everyone, including mother,

acknowledges that father did not receive partial custody of Z.B. as called for in the order of court. In fact, father has enjoyed very few overnight periods of custody with Z.B. for months.

While there is consensus among everyone that the court order regarding Z.B. was not followed, there is profound disagreement about who should be responsible for noncompliance with the court order. Mother seeks to deflect responsibility from herself by blaming Z.B. Mother points out that Z.B. is physically larger than she is and that she cannot force him to obey the court order. In return, father points his finger of responsibility at mother. Father views Z.B.'s current intransigence as the logical culmination of mother's years-long campaign designed to estrange him from Z.B.

## C. Etiology of Current Dilemma

It is simply impossible to understand how mother, father and Z.B. have arrived where they are today without at least some knowledge of historical context.[2] Unfortunately, the history of the Boehler custody dispute is as extensive as it is troubling. Recognizing that it would not be practical to recite everything about the history of the parties' custody battles that may have relevance to what is now before us, we will nevertheless endeavor to summarize some critical themes of the parties' ongoing custody war:

(1) Father is a passionate man who has at times been challenged with anger governance. When father loses his temper — and unfortunately he has done so with his children — he reacts poorly. While we have always stopped short of declaring father to be an abuser of his

---

2. In particular, our 81 page opinion of May 15, 2013 provides critical background information. To the extent necessary, everything we wrote in that opinion is incorporated by reference.

children, we cannot ignore problems that father's anger has caused in his relationship with his own children.

(2) We have appointed independent professionals to work with the children as therapists and/or guardians ad litem. Each of these professionals has communicated that the children are at times afraid of their father. This is not to say that all interaction between father and his children is bad. Far from it. Still, the children are well aware of father's temper, and are in fear of it.

(3) Mother has a desire to be in complete control of all aspects of custody. When given custody authority, mother has exercised it to the exclusion of father. Even during times when father has been named a joint legal custodian, mother made important decisions without even communicating with father. She has also been found in contempt of court on multiple occasions for failing to afford father with physical custody time he was court-ordered to receive. In our most recent custody decision, we afforded mother with primary physical custody, and we granted father only partial custody rights. mother appealed our physical custody schedule to the Superior Court, calling it "aggressive." We have absolutely no doubt that if issues pertaining to custody were left totally in the hands of mother, the result would be complete estrangement between father and his children.

(4) In her interpersonal battles, mother's weapon of choice is manipulation. Rarely does mother seek direct confrontation; she prefers to subtly influence events by appearing sincere while employing hyperbole. In prior opinions, we have extensively chronicled mother's use of manipulative tactics to create estrangement between her children and father. We have learned that when it comes to issues involving custody, we cannot take

mother's statements at face value.

For years, mother promoted a culture of mistrust between father and the children.

Unfortunately, father in some ways ratified the mistrust instilled in the children by mother through his outbursts of anger. Now, both parties are reaping what they have sown in the form of oppositional and defiant behavior by Z.B. No one should be surprised by Z.B.'s intransigence.

D. Mother's Role In Violation of Court Order

Understanding the etiology of Z.B.'s behavior does not excuse it . . . nor does it depreciate the role that mother played in leading Z.B. over the precipice of defiance. For multiple reasons, we can and will link mother to Z.B.'s defiant behavior. The reasons for this decision include the following:

(1) To our knowledge, father's interactions with Z.B. have not involved physicality since the tragic incident that occurred during a custody exchange in Manheim in February of 2012. Despite father's very clear effort to avoid physical confrontation with his son, mother has continued in court to paint father as a child abuser. We have little doubt that she has also promoted this myth to her children in the privacy of their own home.

(2) Mother's reaction to what happened in Manheim provided Z.B. with several unfortunate object lessons. First, mother's obstinate refusal to even consider Z.B.'s conduct as misbehavior probably served to ratify that conduct in Z.B.'s own mind. Second, mother's unwillingness to punish Z.B. for his role in creating the Manheim disaster reinforced to Z.B. that he could violate a custody order without fear of consequence. Finally, mother's willingness to blame

father completely for the incident and her subsequent use of the incident to completely cut off all custody rights effectively ratified Z.B. intransigence and taught Z.B. that father has no authority over him.

(3) As documented extensively in our opinion dated May 15, 2013, mother employed a campaign over many years designed to estrange father from his children. In that campaign, she employed hyperbole and stoked largely irrational fears. By exaggerating events to the point of fabrication, she used the court system to prevent any contact between father and his children for six months.[3] By her words and actions, mother conveyed to the children that father is a violent man who cannot be trusted.

(4) Mother has always been an apologist for her children. We will never forget mother's histrionic reaction when a witness during a prior custody trial articulated an observation that was to this jurist self-evident — that Z.B. was partially at fault in causing the Manheim incident. Even during the most recent contempt hearing, mother repeatedly expressed how punishment imposed on Z.B. was "so hard on him." We do not doubt the love and empathy that mother has for her son, but we do question whether mother has the ability to impose discipline and tough love when needed.

(5) Z.B.'s defiance did not manifest itself overnight. The parties saw it coming. At several points in time, the parties discussed consequences that could be imposed if or when Z.B. refused to visit with his

3. This is only one example of mother's campaign of estrangement. In our opinion of May 15, 2013, we used 10 pages to outline mother's campaign. To fully understand what mother did, one must read pages 22 through 32 of our May 15, 2013 opinion.

father. Instead, mother did not always follow through in withholding privileges from Z.B. When privileges were withheld, mother blamed father. In fact, at one point mother proclaimed her disagreement with suggested consequences and stated: "Z.B. knows it [the consequences] is coming from you and I do not agree with it."

(6) Even up to this day, mother refuses to inconvenience herself in order to ensure that father gets to see his son. At one point when Z.B. was being recalcitrant, father asked mother to drive Z.B. to Lebanon. At another point, father asked mother to bring Z.B. to an early Thanksgiving meal that father had prepared for the children. Mother responded that driving to Lebanon was "too far."

It is clear that the parties have lost control of their son Z.B. It is also very clear to us that mother's negative conditioning and indulgent parenting has played a primary role in this loss of control. Mother's long standing animosity toward father, her years long campaign of estrangement, her consistent unwillingness to involve father in his children's lives, her historical habit of blaming father for all issues of concern, and her more recent unwillingness to impose and follow through with meaningful sanctions for Z.B.'s behavior, have combined to create the environment that engendered Z.B.'s overt defiance. In our opinion, mother's long term and short term behavior has been willful and it directly led to the loss by father of physical custody rights to which he was entitled under our order of court. Accordingly, a finding of contempt is both necessary and appropriate.

## III. REMEDY

Having decided that mother can be found in contempt

of court as a result of Z.B.'s decision not to obey our custody order, we are left to craft an appropriate remedy. Recognizing that civil custody contempt proceedings are remedial, our primary goal must be to craft a remedy that will encourage compliance with the existing custody order. On the other hand, we recognize that crafting a toothless contempt order would probably embolden Z.B. and mother even more than doing nothing at all.

As with most civil contempt orders, we will be providing mother with an opportunity to purge herself of contempt. We do so with the following preconditions:

(1) By requiring that mother cooperate with father's choice for reunification counseling and by requiring that mother provide all transportation requested by father in order to effectuate Z.B.'s attendance at counseling.[4]

(2) After a brief "lead-in" period, the existing custody order will have to be followed by Z.B. Mother will have to double and triple her efforts to ensure that this occurs or else be subject to sanctions that we will address in more detail below. The "lead-in" period of time will encompass the next six weeks. During this six week period of time, father shall be entitled to all

---

4. Father's employment leaves him with a schedule that is far less flexible than that of mother. We anticipate that the reunification counselor will want to meet with Z.B. alone, at least on some occasions. As a practical matter, it will be easier for mother to accomplish transportation for Z.B.'s counseling than it would be to expect father to be able to leave his employment in Lebanon, drive to York and then to the counselor. At some point in the future when father and Z.B. participate jointly in counseling, we urge father to consider undertaking some of the transportation himself. Alone time in a car with a child can provide a precious bonding opportunity. Father could use time driving Z.B. away from counseling sessions to "debrief" with Z.B. as well. With the above being said, we are imposing responsibility upon mother to get Z.B. to counseling, wherever that counseling may occur. If father provides transportation, that is his choice. Our court order imposes primary responsibility for transportation upon mother.

holiday periods of custody with Z.B. (including holiday overnights), one weekend including overnights with Z.B. and his normal Wednesday night periods of partial custody with Z.B. Starting after January 1, 2015, father shall be entitled to enjoy all of the custody rights with Z.B. provided for in the court order.[5]

(3) At some point during the next six weeks, we will ask GAL Parker to undertake a private dinner meeting with Z.B. Mother is to facilitate and pay for this dinner. At this meeting, GAL Parker is to communicate bluntly and with as much force as needed that Z.B. will not be permitted to drive the ship of custody. Attorney Parker may also communicate the nature of consequences that could be imposed if the custody order is not followed.

The above represents the remedial aspects of the contempt order we will be entering today. We wish to emphasize to everyone that if all of the remedial aspects of our order are fulfilled over the next twelve months, mother's contempt finding will be purged and no sanctions will be imposed against her at all.

On the other hand, if mother does not fulfill the remedial provisions of our court order, father will be at liberty to request a sentencing hearing. If at that sentencing hearing we determine that mother has not in fact fulfilled the remedial aspects of our order, we shall impose consequential sanctions. Those consequential sanctions will include payment by mother of all of father's counsel fees that have been incurred relative to this contempt proceeding and will be incurred in the future. We estimate

---

5. The "lead-in" period of time is designed because father and Z.B. have not had overnight time with one another very often over the past several months. More important, we want to afford time for reunification counseling to begin and we want to afford both mother and GAL Parker with time to meet with Z.B. and have blunt discussions with him.

that those fees will exceed $2,000.00. In addition, we would consider a request for additional sanctions. Those additional sanctions could include a fine, a brief period of incarceration, or even an order that would specifically require that privileges be withheld from Z.B. Other than counsel fees, we make no promises today about what our ultimate sanctions will include. Such a decision will be deferred pending the sentencing hearing outlined above.

A court order to effectuate the remedies and findings referenced above will be entered today's date.

## ORDER OF COURT

And now, this 25th day of November, 2014, after hearing and in consideration of the testimony adduced, the court determines that Beth Ann Boehler (hereafter "mother") is in contempt of court because Jeffrey J. Boehler (hereafter "father") has not enjoyed physical custody time with his son Z.B. that is required by the existing custody order. mother may purge herself of contempt by complying over the next twelve months with the following:

1. By respecting father's decision regarding reunification counseling and cooperating with it as required;

2. By providing all transportation for reunification counseling that is requested of her by father;

3. Over the next six weeks, by ensuring that Z.B. attends all required holiday periods of physical custody, by ensuring that Z.B. attends one weekend period of physical custody and by ensuring that Z.B. attends all Wednesday evening periods of physical custody;

4. Commencing after January 1, 2015, by ensuring that the existing custody order is followed in all respects; and

5. By ensuring that Z.B. attends a dinner meeting with

GAL Wiley Parker to be scheduled in December of 2014.

In the event that mother does not purge herself of contempt by completing the above, father is granted leave to request a sentencing hearing. If after that sentencing hearing we determine that mother has not in fact purged herself of contempt, we will impose sanctions that will include a requirement that mother pay father's counsel fees and may include other consequences as well.

As additional directives ancillary to the above, this court directs as follows:

1. GAL Wiley Parker shall meet with Z.B. for a private dinner meeting to be conducted at attorney Parker's convenience during December of 2014. Attorney Parker is to engage in a blunt discussion with Z.B. about the requirements of the custody order and the consequences that could flow from violating that custody order.

2. Although a specific directive is not needed given father's status as primary legal custodian, we nevertheless wish to specifically authorize father to hire a reunification counselor of his own choosing. It shall not be necessary for father to obtain mother's consent with respect to the identity of a reunification counselor.