Brocker, Appellant, *v.* Brocker.

514

Argued October 2, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused May 24, 1968.

*Harvey E. Schauffler, Jr.,* for appellant.

*Norman D. Jaffe,* with him *Galbreath, Braham, Gregg, Kirkpatrick, Jaffe & Montgomery,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, March 15, 1968:

This is an appeal from a contempt Order issued by the Court of Common Pleas of Butler County, Pennsylvania. The Order held Dr. Brocker, the appellant, to be in contempt of Court for failure to comply with and obey its Custody Order of June 18, 1965, requiring Brocker to return his minor children to their mother at the end of a summer visitation period. This case has been rendered difficult because, inter alia, of the many diverse and offsetting motions by each of the parties, the sequence of events, and the material differences between Brocker's two counsel.

### The Facts

Dr. and Mrs. Brocker were divorced by the Court of Common Pleas of Butler County on *October 15, 1964*. At that time Mrs. Brocker was a resident of and was domiciled in Butler County, and Dr. Brocker was a resident of Ohio. The Order granting the divorce incorporated the written agreement of the parties for the custody and support of their six minor children. It pertinently provided: "Wife shall have the custody, care and charge of all the children of the parties herein in accordance with the existing Orders of the Common Pleas Court of Butler County, Pennsylvania, *or as they shall be changed or amended from time to time; and for this purpose the parties herein agree and submit themselves to the continuing jurisdiction of the Common Pleas Court of Butler County,* Pennsylvania, which Court shall have jurisdiction over all matters relating to the custody of said minor children, *regardless of the residence or domicile of the parties herein or their children, outside the geographic jurisdiction of said court.*"*

The aforesaid Order of the Butler County Court dated October 15, 1964 was amended by it on *June 18, 1965,* sur the Petition of Dr. Brocker (the father and husband), to provide that the Father (who is the present appellant) shall have custody of the six children during the summer vacation periods, commencing on the fifth day after the end of the spring school term and *ending five days prior to the beginning of the fall term.*

In accordance with this Amended Order, the children were delivered to the Father five days after the end of the spring school term, to spend the summer at

---

* Italics throughout, ours.

his residence in Ohio. At the end of the summer vacation period, the Father failed to return the children to their Mother (who continued to live in Butler County, Pennsylvania), as required by the aforesaid Amended Order of the Court.

On *August 10, 1966,* the Father presented to the Court of Common Pleas of Butler County a Petition for modification of that Court's aforesaid Amended Custody Order. His Petition alleged the unfitness of the Mother and prayed that permanent custody of the children be awarded to him. The Court thereupon issued a Rule upon the Mother to show cause why permanent custody of the children should not be given to the Father, and a guardian ad litem was appointed by the Court to represent the rights, interests and welfare of the children. The Rule was returnable *October 11, 1966,* which would have been more than a month after the children should have been returned to their Mother, i.e., five days prior to the beginning of the fall term of the new school year. The record then impliedly indicates that on August 25, 1966, Dr. Brocker instituted proceedings in the State of Ohio for the custody of the children; the record does not disclose whether the Mother appeared in said action either personally or through counsel, or what, if any, action was taken by the Ohio Court.

On *August 12, 1966 (prior to* Dr. Brocker's above-mentioned custody suit in Ohio on August 25), the Mother filed a Petition with the Butler County Court (1) praying that her former husband be held in contempt for failure to pay support for their children as required by the Order of that Court, and (2) praying for an increase in the Court's original Support Order. A Rule to show cause was issued on Brocker and a hearing was held on August 30, 1966, at which Dr. Brocker's Butler County attorney Gilchrist entered his

appearance. During the course of this hearing, counsel for the Mother presented *another Petition* to that Court praying that *Brocker be held in contempt for his failure to return the children* to her *on August 25,* 1966 pursuant to the aforesaid Amended Custody Order of the Butler County Court, and that an attachment issue.

On *August 31,* after the conclusion of this hearing, the Butler County Court modified its Support Order by increasing the amount of support to $150 a month for each child. The next day, *September 1,* 1966, that Court issued a Rule on Dr. Brocker to show cause why he should not be held in contempt for failure to return their children to their Mother. This Rule was returnable on the afternoon of the following day, namely September 2nd. The Court obviously was concerned about having the children returned to the Mother in time for the new school year, and this occasioned the prompt scheduling of a hearing. While the record is not clear as to exactly what happened thereafter, the Court continued the hearing on the Rule until Tuesday, September 6, at 4:00 P.M. However, neither Brocker nor his counsel appeared at the hearing on *September 6.* The Court thereupon entered a Contempt Order which (1) assessed a penalty against Brocker in the amount of $25,000 payable to the County, and (2) provided for commitment of Brocker to prison pending compliance, and (3) further provided: *"The penalty is hereby remitted if the defendant purges himself* of his contempt by obedience to the orders of this Court within five days from this date [September 6, 1966]." *From this Contempt Order,* Brocker took this appeal.

## Contempt

In order to properly evaluate appellant's contentions, it is necessary to briefly review the law with

respect to contempt and its divisions, which are some-
times obscure.

The Courts have always possessed the inherent pow-
er to enforce their Orders and Decrees by imposing
penalties and sanctions for failure to obey or comply
therewith. *Commonwealth ex rel. Beghian v. Beghian,*
408 Pa. 408, 184 A. 2d 270; *Knaus v. Knaus,* 387 Pa.
370, 127 A. 2d 669; *Michaelson v. United States,* 266
U.S. 42; *Green v. United States,* 356 U.S. 165; *United
States v. United Mine Workers of America,* 330 U.S.
258; *Commonwealth ex rel. v. Perkins,* 124 Pa. 36, 16
Atl. 525; *Penn Anthracite Mining Co. v. Anthracite
Miners of Pennsylvania,* 114 Pa. Superior Ct. 7, 174
Atl. 11; *Commonwealth v. Sheasley,* 102 Pa. Superior
Ct. 384, 157 Atl. 27.

Contempt is divided legally into two classes: (1)
Civil Contempt and (2) Criminal Contempt, (a) direct
contempt and (b) indirect contempt. *Knaus v. Knaus,*
387 Pa., supra; *Philadelphia Marine Trade Assn. v.
International Longshoremen's Assn.,* 392 Pa. 500, 140
A. 2d 814; *Commonwealth ex rel. Beghian v. Beghian,*
408 Pa., supra; *Marco Industries, Inc. v. United Steel-
workers of America,* 401 Pa. 299, 164 A. 2d 205.

*The dominant purpose* and objective of the Court's
Order is the *controlling* factor in the determination of
whether the contempt was civil or criminal. Not only
is the dividing line between civil and criminal con-
tempt sometimes shadowy or obscure, but the same
facts or conduct may constitute or amount to both
civil and criminal contempt. *United States v. United
Mine Workers of America,* 330 U.S., supra. Moreover,
it is clear that a Court can for present or past acts
of misbehaviour amounting to civil contempt impose
an unconditional compensatory fine and/or a condition-
al fine and imprisonment, and such fine may be pay-

able to the United States or to the Commonwealth or to the county or to the individual who was injured. *United States v. United Mine Workers of America,* 330 U.S., supra; *McComb v. Jacksonville Paper Co.,* 336 U.S. 187; *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418; *Commonwealth ex rel. Beghian v. Beghian,* 408 Pa., supra; *Parker v. United States,* 126 F. 2d 370.

In *Parker v. United States,* the Court said (page 380) : "It is well settled, however, that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender. Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 448, 449, 31 S. Ct. 492, 55 L. Ed. 797, 34 L.R.A., N.S., 874; Lamb v. Cramer, 1932, 285 U.S. 217, 220, 221, 52 S. Ct. 315, 76 L. Ed. 715; Merchants' Stock & Grain Co. v. Board of Trade, 8 Cir., 1912, 201 F. 20, 30; Delaware, L. & W. R. Co. v. Frank, 2 Cir. 1916, 230 F. 988; American Graphophone Co. v. Walcutt, C.C.S.D.N.Y. 1898, 86 F. 468; Kreplik v. Couch Patents Co., 1 Cir., 1911, 190 F. 565, 569; Raymor Ballroom Co. v. Buck, 1 Cir. 1940, 110 F. 2d 207, 211; Aerovox Corp. v. Concourse Electric Co., 2 Cir. 1937, 90 F. 2d 615, 617; Lineker v. Dillon, D.C.N.D. Cal. 1921, 275 F. 460, 470, 476."

In *United States v. United Mine Workers of America,* 330 U.S., supra, the Supreme Court held that the trial Court properly found John L. Lewis guilty of indirect criminal contempt and the Union *guilty of both civil and criminal contempt.* The Court sustained a fine of $10,000 against Lewis for criminal contempt, but modified the fine imposed by the lower Court upon the Union. The Supreme Court ordered the Union (a) to

pay a fine of $700,000 and (b) to pay an additional fine of $2,800,000 unless the Union complied with the lower Court's temporary restraining Order and preliminary injunction within five days of the Supreme Court mandate. The Court said, inter alia (pages 298-299, 303-304) : "Common sense would recognize that conduct can amount to both civil and criminal contempt. . . . The trial court also properly found the defendants guilty of civil contempt. *Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.* Gompers v. Bucks Stove & Range Co., supra, at 448, 449. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.

"But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

"It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant."

522

### The Contempt Order

*Commonwealth ex rel. Beghian v. Beghian,* 408 Pa., *supra,* is analogous to the facts in the instant case. In the *Beghian* case, temporary custody of two minor children during the summer months was awarded to their father, who lived in Italy. He refused to return the children at the end of the summer, whereupon the Court of Common Pleas of Allegheny County held the father in both criminal and civil contempt. On appeal, this Court held that the father's willful violation of the custody order constituted civil, but not criminal contempt. The Court said (pages 411-412) : ". . . The problem most often presented in contempt cases is whether it is criminal or civil, and perhaps it is more difficult to distinguish between civil and indirect criminal contempt. It is therefore necessary to refer to the essential purpose of the proceeding. In Knaus v. Knaus, 387 Pa. 370, 376, 127 A. 2d 669, 672 (1956), it was said: *'The dominant purpose of a contempt proceeding determines whether it is civil or criminal. If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public,* it is a proceeding for criminal contempt. But where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed (1) to coerce the defendant into compliance with the court's order, and (2) in some instances to compensate the complainant for losses sustained: United States v. United Mine Workers of America, 330 U.S. 258, 303. A judgment in a civil contempt proceeding for the benefit of a

private plaintiff will, of course, incidentally vindicate the authority of the court just as on the other hand a criminal contempt judgment, which is punitive, may often advance private interests. But the test is the dominant purpose, not the incidental result: Gompers v. Bucks Stove & Range Company, 221 U.S. 418, 441.'"

In *Knaus v. Knaus*, 387 Pa., supra, the Court said (page 375): "A direct criminal contempt consists of misconduct of a person in the presence of the court, or so near thereto to interfere with its immediate business, and punishment for such contempts may be inflicted summarily: Act of June 16, 1836, P. L. 784, §§23, 24, 17 P.S. §§2041, 2042; Levine Contempt Case, 372 Pa. 612, 95 A. 2d 222; Snyder's Case, 301 Pa. 276, 152 A. 33. An indirect criminal contempt consists of the violation of an order or decree of a court which occurs outside the presence of the court: Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania et al., 318 Pa. 401, 178 A. 291; Kegg et al. v. Bianco et al., 151 Pa. Superior Ct. 234, 30 A. 2d 159. The procedural safeguards applicable to a commitment for an indirect criminal contempt are set forth in the Act of June 23, 1931, P. L. 925, §1, 17 P.S. §2047, which requires admission to bail, notice, a reasonable time to make a defense and affords trial by jury. Section 2 of that Act (17 P.S. §2048) limits punishment to a maximum of a fine of $100, or imprisonment for fifteen (15) days, or both."

In this case it is clear that Brocker was guilty not of criminal contempt but only of *civil* contempt—Mrs. Brocker, the children's Mother, will benefit *primarily* from compliance with the Court's Order (even though the fine was payable to the County) and the dignity and authority of the Court will be *incidentally* vindicated.

524

## Notice

Appellant Brocker contends he cannot be held in contempt of the Court's Amended Order of June 18, 1965, because he had no notice, or no adequate notice, of the Court's contempt hearing on September 6, 1966. We need not decide whether he was entitled to notice of this hearing on September 6, 1966, and if so whether the Court's short notice of the hearing was adequate, because he was penalized and held in contempt of Court for *failure to comply with the Court's Amended Custody Order of June 18, 1965, of which Brocker was fully cognizant.* Appellant has never offered any legal justification for his failure to comply with this Amended Order, nor has he offered to now comply therewith.

## Jurisdiction

While a Custody Order or Decree is always subject to modification or complete change by the proper Court, *acting in the best interest and for the best welfare of the children,* it cannot be ignored or violated by one of the parties at his (or her) whim, or changed by another Court unless that Court had both appropriate and constitutionally recognized jurisdiction. While it is a general rule that the domicile or residence—even temporary residence—of a child is sufficient to give jurisdiction to the Court of the County of such residence, the law on the subject of jurisdiction in child custody cases is conflicting and needs clarification and certainty.

In the instant case, both parents agreed that "the Common Pleas Court of Butler County should have *continuing jurisdiction* over all matters relating to the *custody* of their minor children, *regardless of the residence or domicile of the parties . . . or their children,*

*outside the geographic jurisdiction of said court."* The interpretation of this Agreement by the dissenting Judges distorts and nullifies this language. Moreover, under all the facts in this case, especially when there is no proof of changed circumstances, Comity alone should prevent an Ohio Court from interfering with or changing the Amended Custody Order of the Butler County Court. Even more important, the Full-Faith-and-Credit clause of the Constitution of the United States—Article IV, §1—would seem to require every Court in Ohio to give full faith and credit to the Pennsylvania Court's Custody Order and, in the absence of substantial and important changed circumstances, an Ohio Court should not be permitted to ignore or nullify or modify the Pennsylvania Court's Custody Order. Were the law otherwise, all a parent would have to do would be to move to another State (or from State to State) and keep or steal the children. The result (1) would be frequent litigation in different Courts in the different States, with conflicting Court Orders which would inevitably have a disturbing and detrimental effect upon the welfare of the children,* and (2) would greatly diminish the respect of the public for all Courts, and (3) most important of all, would make a mockery of, and in practical effect obliterate, the Full-Faith-and-Credit clause of the Constitution. This we will not permit!

Under the facts and circumstances of record, the Court of Common Pleas of Butler County did not err in holding Brocker in contempt of Court. Brocker obtained possession of the children solely under the

---

* Despite the protestations of a Court which is frequently unintentionally biased in favor of the home town parent, a child has too often become, in custody cases, a mere pawn in a game of chess or, worse yet, a shuttlecock in a game of badminton or of battledore and shuttlecock.

visitation privileges granted him in the Amended Custody Order of the Butler County Court of *June 18, 1965*. Brocker knew that this Amended Custody Order obligated him to return these children to their mother in Butler County, Pennsylvania, in time for them to begin (five days prior to the beginning of) the fall term of their school. This he failed to do, nor did he make any justifiable or legal explanation to the Butler County Court (or even to this Court in his present appeal) for his failure to comply with the Court's Order.

## The Penalty

Finally, appellant argues that the $25,000 penalty constitutes an "inappropriate and illegal" punishment for civil contempt. Compare *Knaus v. Knaus*, 387 Pa., supra; *Com. ex rel. Beghian v. Beghian*, 408 Pa., supra; *Philadelphia Marine Trade Assn. v. International Longshoremen's Assn.*, 392 Pa., supra.

While a Court in a proceeding for civil contempt may impose the remedial punishment of a fine and make it *payable to an aggrieved litigant* as compensation for the losses or damages he may have sustained by reason of the contumacious conduct of the offender, and may also conditionally commit the defendant to prison for civil contempt, the penalty of $25,000 in this case was (as we have seen) *payable to the County*, and it was to be remitted if defendant purged himself of his contempt. See *Parker v. United States*, 126 F. 2d 370, 380, and numerous cases cited therein; *United States v. United Mine Workers of America*, 330 U.S., supra; *McComb v. Jacksonville Paper Co.*, 336 U.S. 187; *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418; *Williamson's Case*, 26 Pa. 9.

Order affirmed; costs to be paid by appellant.

Concurring Opinion by Mr. Justice Roberts:

Fundamental to the concept of due process is the notion that the law should never be permitted to direct its punitive force against a man unless that man is first given an opportunity to defend himself. To insure that this opportunity be not lost as a whisper in a windstorm, the law has created strict and often formal procedures whereby a potential defendant is notified of each proceeding at which his rights may be affected. Thus, when a court undertakes, on petition of a private citizen, to hold a man in contempt, it is absolutely imperative that the defendant be notified of the pendency of this drastic action, and be apprised of the exact time and place at which a hearing will be held to determine whether punishment will be meted out. To hold, therefore, as the majority has done in the present case, that Dr. Brocker need not have been notified of the September 6, 1966 contempt hearing simply because he must have been aware that he was violating a June 18, 1965 custody order is to ignore both due process of law and reality itself.

As far back as 1912 this Court has held that a man may not be held in contempt of court "without such previous notice as will afford him an opportunity of being heard." *Douglass-Whisler Brick Co. v. Simpson,* 233 Pa. 517, 519, 82 Atl. 760 (1912). That rule remains unchanged. Nor will it suffice to say that the present defendant did not *need* any notice of the contempt hearing since he must have known that, by failing to return the children at the conclusion of summer vacation, he was violating a custody order issued over a year before. Indeed, this line of reasoning not only reduces itself to the proposition that a defendant need never be given notice of any contempt proceeding, but it also assumes that, in the present case at least, Dr. Brocker must be held to have known that by fail-

ing to return the children he was not only violating the decree, but was also subjecting himself to a contempt citation by so doing. This second assumption, I believe, is completely unfounded. In fact, there is every reason to believe that Dr. Brocker felt assured that his actions were completely *within* the letter of the law.

It is uncontradicted that on August 10, 1966 Dr. Brocker petitioned the Court of Common Pleas of Butler County for an amendment of the June 18, 1965 custody order, alleging that he should be granted complete custody of the children on the grounds that Mrs. Brocker was an unfit mother; pursuant to that petition, a rule was issued upon Mrs. Brocker to show cause why the children should not be given to Dr. Brocker, said rule to be returnable October 11, 1966. Certainly, having secured the rule to show cause, Dr. Brocker need not have assumed that he would be in contempt of court by failing to return the children in August. Furthermore, when he realized that the Butler County court was not going to act on his petition in time to decide the matter before the September school term began, Dr. Brocker then commenced an action in an Ohio court on August 25, 1966. In fact, according to appellant's brief, not contradicted by appellee, he has now been awarded custody of the children by Ohio. Thus, when it is considered that appellant, at the time of the contempt hearing on September 6, had not one, but *two* court actions pending to obtain custody of the children, it seems a gross deprivation of due process to hold that he was not entitled to formal notice of the Butler County contempt proceeding simply because he should have known that his actions were a violation of the June decree.

Nevertheless, although I believe that Dr. Brocker was entitled to notice of the hearing, a careful exami-

nation of the record convinces me that such notice was in fact given. Since Dr. Brocker's Pennsylvania counsel was from Pittsburgh, he decided to retain a Butler County lawyer to represent his interests in that forum. The record reveals that although Dr. Brocker himself did not appear, nevertheless his Butler counsel not only was present on August 30, 1966, the day the contempt petition was filed, but was also in court on September 2, the return day for the contempt rule. On that day, counsel asked the court to postpone the contempt hearing to September 6 and this request was granted. Later that same day, Butler counsel was permitted to withdraw from the case, but only after he had assured the judge that he *had* contacted Brocker's Pittsburgh attorney and told him of the hearing scheduled for September 6. On this appeal, appellant claims that his Pittsburgh counsel was never told this information. However, there is nothing in the record to support this contention except the bare fact that no one appeared on Brocker's behalf on the sixth. Absent something more than this, I would be loathe to conclude that the Butler attorney falsified information, in open court, before a judge of his own county merely to withdraw from a case. I would therefore hold that Brocker's Pittsburgh counsel did have notice of the contempt proceeding; since notice of this sort to the lawyer should certainly bind the client, I conclude that Brocker's rights were not violated at this juncture of the litigation.

It is the majority's resolution of the merits of the contempt citation, however, that gives me greatest pause. Although I do not agree with appellant that the mere commencement of an Ohio custody proceeding relieves him of liability for contempt in Pennsylvania, nevertheless I am also unable to subscribe to the majority's notion that Ohio can do *nothing* to the June

18, 1965 custody order absent "substantial and important. changed circumstances.". Not only does the majority fail to offer the slightest explanation of what constitutes a "substantial" and "important" changed circumstance, as opposed to the simple "changed conditions" which Pennsylvania cases require to alter a custody decree, see cases, infra, but the majority also interprets the thrust of Full Faith and Credit in this area in a manner seemingly contrary to the Supreme Court of the United States.

In *New York ex rel. Halvey v. Halvey*, 330 U.S. 610, 67 S. Ct. 903 (1947), the mother had left her husband, taking their child to Florida while Mr. Halvey remained in New York. While in Florida she was granted a divorce and permanent custody of the child. However, on the day before the Florida custody order was officially rendered, Mr. Halvey traveled to Florida and spirited the child back to New York. Mrs. Halvey followed him North, and armed with her Florida custody decree brought habeas corpus in New York for return of the child. When New York, although returning the child, also *modified* the Florida custody decree to grant the father summer visitation rights, Mrs. Halvey appealed, arguing that under the Full Faith and Credit Clause, New York could not alter the Florida decree. After first pointing out that Florida itself could have modified its own custody decree, the Supreme Court held that New York did not have to give the Florida decree any *more* Full Faith and Credit than Florida would have given it. It therefore affirmed the state tribunal saying succinctly: "So far as the Full Faith and Credit Clause is concerned, what Florida could do in modifying the decree, New York may do." 330 U.S. at 614, 67 S. Ct. at 906. Thus, the conclusion is inescapable that in the present case, Dr. Brocker may justifiably rely on any custody award made by the Ohio

court so long as a similar award could have been made by Pennsylvania, and so long as Ohio had proper jurisdiction.

It is no longer open to question that Pennsylvania custody decrees may be modified if conditions change which affect the child's welfare. *Commonwealth ex rel. O'Hey v. McCurdy,* 199 Pa. Superior Ct. 22, 24, 184 A. 2d 290, 291 (1962); *Commonwealth v. Bishop,* 185 Pa. Superior Ct. 362, 367, 137 A. 2d 822, 824 (1958). In *Bishop,* the court insisted: "Orders determining the custody of children are temporary in their nature and are *always* subject to modification to meet changed conditions." (Emphasis supplied.) Certainly it would seem that a finding if immoral behavior by the child's mother (as was here alleged) would be more than sufficient to meet our changed conditions test. Thus, under *Halvey,* Ohio could modify the June 18, 1965 Pennsylvania decree if that forum found that Mrs. Brocker's behavior had deteriorated to the extent claimed by her ex-husband.

So also am I convinced that on August 9, 1966, when Dr. Brocker began his Ohio action, that forum had jurisdiction to modify the 1965 custody decree. Under Ohio law, a court has jurisdiction to determine custody of a child so long as the child and one parent are present in that state when the action is commenced. *Reed v. Reed,* 11 Ohio Misc. 93, 40 Ohio Op. 2d 327, 229 N.E. 2d 113 (C.P. 1967); *Noble v. Noble,* 80 Ohio L. Abs. 581, 160 N.E. 2d 426 (C.P. 1959); cf. *Black v. Black,* 110 Ohio St. 392, 144 N.E. 268 (1924). Since it is undisputed that on August 25, 1966 the Brocker children were lawfully in Ohio with their father pursuant to the June 18, 1965 custody order, Ohio's jurisdiction cannot be questioned by Pennsylvania. In fact, it would seem that under *Halvey,* Ohio would have jurisdiction even if the children had been unlawfully

taken into that state, for in *Halvey* itself the children had been secretly taken from Florida to New York without the knowledge or consent of the mother who had just been awarded custody by a Florida court. Yet it was nevertheless held that New York had jurisdiction to modify the Florida decree.

The majority lays great stress upon the agreement entered into between Dr. and Mrs. Brocker that Butler County would have continuing jurisdiction over matters concerning custody of the children regardless of their residence. From this the majority concludes that Ohio had no jurisdiction. However, the contract language nowhere recites that Butler County shall have *exclusive* jurisdiction. Rather I believe that a fair reading of this agreement shows that it was made simply to *permit* a Pennsylvania action where there might not otherwise be jurisdiction. It was not intended to prevent a second state from exercising concurrent jurisdiction.

Admittedly, the record in this case does not indicate the final outcome of Dr. Brocker's Ohio action, although it was acknowledged below that such action had been commenced on August 25, 1966. Only in appellant's brief is there any statement that this action has proceeded to judgment. It is there recited that Ohio has awarded custody of the children to Dr. Brocker. However, absent any indication in the record below of the resolution of the Ohio proceeding, I would at this time be unwilling to hold that Dr. Brocker is not in contempt of court for his failure to return the children to Pennsylvania. Rather, I believe that the proper resolution of this controversy requires that we leave the contempt citation undisturbed with the understanding that Dr. Brocker may purge himself of contempt by demonstrating to the Butler County court that he has been awarded custody of the children by

Ohio, or that he has returned the children to Pennsylvania.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

In *Commonwealth ex rel. Beemer v. Beemer,* 200 Pa. Superior Ct. 103, 188 A. 2d 475 (1962), the Superior Court held that, in a child custody case, where a party had *flagrantly* disobeyed an order of the trial court and was held in contempt, an appeal from such order should be quashed. Judge WATKINS, speaking for the Superior Court, said: "There are a rash of modern instances where court orders are disobeyed with impunity and respect for the law and the courts thereby weakened. It seems, therefore, that it is the duty of the appellate courts to see to it that every assistance is extended to the courts of the Commonwealth so that orders are meticulously carried out as otherwise the dignity of the judiciary, the majesty of the law and its enforcement are clearly undermined." (p. 106). We agree with the rationale of *Beemer* "that it is contrary to the principles of justice to permit one who has flaunted [sic] the orders of the courts to seek judicial assistance. . . ." (pp. 107-8).

In *Commonwealth ex rel. Goodwin v. Goodwin,* 413 Pa. 551, 198 A. 2d 503 (1964), we adopted the rationale of *Beemer.*

The record in the case at bar indicates a *flagrant* disobedience by Dr. Brocker of the orders of the Court of Common Pleas of Butler County. Even after this Court had granted supersedeas in connection with this appeal, Dr. Brocker wilfully disobeyed the condition upon which the supersedeas had been granted and persists in such disobedience to the orders of this Court. Under these circumstances, until Dr. Brocker stands ready and willing to obey the orders both of the court

534

below and this Court, he should be denied judicial assistance at the appellate level.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

In *Commonwealth ex rel. v. Daven*, 298 Pa. 416, 148 Atl. 524 (1930), we held that whenever a court is called upon to award custody of a child the fact that another jurisdiction has made an award is of no import. In *Daven*, the mother surreptitiously moved her children from North Carolina in violation of an order of a North Carolina court and we held that the order of the North Carolina court is important here only insofar as it may have a bearing upon the mother's fitness to be awarded custody of the children.

If here the Ohio court has exercised jurisdiction over the children by making an award of their custody to the father, our courts should have no feeling of frustration since we indulge in the same "ouster" of sister-state orders in custody matters. Since the record does not clearly indicate that the Ohio court has made an order awarding custody of the children to the father, I would vacate the contempt adjudication and penalty imposed by the court below and remand the case for the purpose of determining the existence of such order.

I dissent.