J-S32045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| AMRES CORPORATION AND STEPHEN MARK WILSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIRILL AYZENBERG | : | |
| | : | No. 2640 EDA 2023 |
| Appellant | : | |

Appeal from the Order Entered October 10, 2023
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2022-01224

BEFORE:  LAZARUS, P.J., STABILE, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED DECEMBER 17, 2024**

Appellant, Kirill Ayzenberg, appeals from the order entered in the Bucks County Court of Common Pleas, which found Appellant in contempt and imposed sanctions.  We affirm in part, vacate in part, and remand for further proceedings.

The relevant facts and procedural history of this case are as follows. Appellee Amres Corporation[1] is a business which provides residential and commercial loan banking.  From 2015 through 2022, Appellant and Appellee, Stephen Mark Wilson ("Wilson"), were principals of Amres, each owning 50% of the shares of the company.  However, in 2021, Appellant and Wilson engaged in disputes over the management and operation of the company. Ultimately, they decided to end their business relationship, and on January

_____

[1] In many of the filings, Amres is stylized "AmRes."

27, 2022, entered into a redemption agreement. That agreement provided that, by April 1, 2022, Appellant would transfer his shares in Amres to Wilson. Further, the agreement provided that in the event of a default regarding the agreement, the non-defaulting party "will be entitled to pursue all available legal rights and remedies. The parties specifically agree to start with mediation through a mutually agreed upon mediator." (**See** Compl., 3/14/22, Ex. A, Redemption Agreement).

Despite this agreement, on March 14, 2022, Amres filed a complaint against Appellant, alleging that Appellant had refused to transfer his interest in Amres unless Wilson agreed to additional conditions that were not part of the original redemption agreement. The complaint sought equitable relief in the form of an order directing Appellant to refrain from further violating the agreement and included additional counts for specific performance and breach of fiduciary duties. The alleged breaches included using company funds as collateral for personal loans and/or withdrawing company funds without authorization. That same day, Amres filed an additional petition seeking injunctive relief against Appellant.

On March 17, 2022, the court issued a special injunction order preventing Appellant from withdrawing, pledging, or assigning any money or other assets of Amres, and scheduled a hearing on the matter.[2]

On May 20, 2022, following a hearing, the court ordered the parties to

---

[2] That same day, Appellant commenced a separate action against Amres, although the parties later agreed to consolidate the two cases.

- 2 -

participate in mediation, as well as to "comply with all terms and conditions of the Redemption Agreement, the terms of which are approved and incorporated as the Order of this [c]ourt," under pain of contempt. (***See*** Order, 5/20/22, at 1-2). On August 8, 2022, the mediator conducted a settlement conference, which both parties and their respective counsel attended. At the conclusion of the conference, the parties agreed to the entry of a consent order resolving all outstanding issues in the litigation.

In relevant part, the consent order provided that Nextres, LLC ("Nextres"), Appellant's corporation, would purchase all sale loans of Amres that were not delinquent. Specifically, on or before August 17, 2022, the parties would execute letters of intent on the sale loans, and upon Amres' receipt of the executed letters of intent, Amres would "instruct the applicable warehouse lenders and/or custodian to release the collateral files to [Appellant] and/or [Nextres], including the original notes and mortgages, closing packages and executed assignments and allongers to [Nextres] which shall not be recorded until after the Closing Date." (***See*** Consent Order, 8/8/22, at ¶ 7). On August 11, 2022, the court approved the consent order, which provided for a closing date no later than September 15, 2022.

Subsequently, Amres instructed the warehouse lender, Churchill Bank, to release the collateral files to Appellant and Nextres. However, Churchill Bank did not release the collateral files directly to Appellant. Thereafter, Appellant failed to attend the September 15, 2022 closing. Additional litigation ensued, with the parties filing numerous motions and petitions

alleging that each was in contempt of the consent order. The renewed litigation resulted in four days of hearings in February and March 2023.

On May 15, 2023, the court granted Amres' motion to enforce the consent order and found Appellant in willful contempt of the consent order. The court denied and dismissed Appellant's petition for contempt with prejudice and ordered Appellant to pay sanctions in an amount to be determined at a subsequent hearing.

On October 4th and 5th, 2023, the court held hearings. On October 6, 2023, the court granted Amres' motion for sanctions and awarded Amres $90,000 in counsel fees, and fined Appellant an additional $10,000 to be paid to the Bucks County Court of Common Pleas.

On October 10, 2023, Appellant timely filed a notice of appeal. On October 12, 2023, the trial court ordered Appellant to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On November 6, 2023, Appellant timely complied.[3]

---

[3] Although Appellant's Rule 1925(b) statement lists two issues, the statement is not concise. It includes five subsections spanning two pages, with the second issue including four subsections taking up an entire page. We caution Appellant that a voluminous Rule 1925(b) statement, which results in the trial court's difficulty identifying and addressing issues on appeal, risks dismissal of the appeal. *See, e.g., Tucker v. R.M. Tours*, 939 A.2d 343 (Pa.Super. 2007), *aff'd*, 602 Pa. 147, 977 A.2d 1170 (2009) (concluding that appellants engaged in misconduct by filing Rule 1925(b) statement that intended to overwhelm courts; explaining that Rule 1925(b) is not satisfied by filing any statement; rather, statement must be concise and coherent to permit trial court to understand specific issues being raised on appeal). We will not deem Appellant's issues waived on this basis, however, as the trial court was able to address the majority of Appellant's claims.

On appeal, Appellant raises the following issues for review:

Whether the Consent Order was definite, clear and specific about the performance required of [Appellees] under Paragraph 7b of the Consent Order.

Whether Appellees' failure to comply with the Consent Order constituted civil contempt by Appellees.

Whether [Appellees] failed to show the elements of contempt where closing under the Consent Order was excused by [Appellees'] nonperformance or by the action of third parties.

Whether the denial of [Appellant's] Motion with prejudice denies [Appellant] the opportunity to present his case at trial.

Whether the trial court erred as a matter of law on damages.

(Appellant's Brief at 6-7).

"In reviewing a trial court's finding on a contempt petition, we are limited to determining whether the trial court committed a clear abuse of discretion." *Rogowski v. Kirven*, 291 A.3d 50, 57 (Pa.Super. 2023) (quoting *P.H.D. v. R.R.D.*, 56 A.3d 702, 706 (Pa.Super. 2012)). "This Court must place great reliance on the sound discretion of the trial [court] when reviewing an order of contempt." *Id.*

"In proceedings for civil contempt of court, the general rule is that the burden of proof rests with the complaining party to demonstrate that the defendant is in noncompliance with a court order." *MacDougall v. MacDougall*, 49 A.3d 890, 892 (Pa.Super. 2012), *appeal denied*, 621 Pa. 679, 75 A.3d 1282 (2013) (citation omitted).

> For a person to be found in civil contempt, the moving party must prove that: (1) the contemnor had notice of the specific order or decree that he disobeyed; (2) the act constituting the violation was volitional; and (3) the contemnor acted with wrongful intent. **Marian Shop, Inc. v. Baird**, 670 A.2d 671, 673 (Pa.Super. 1996). The order alleged to have been violated "must be **definite, clear, and specific**—leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct" and is to be strictly construed. **Id.** (emphasis in original).

**Gunther v. Bolus**, 853 A.2d 1014, 1017 (Pa.Super. 2004), *appeal denied*, 578 Pa. 709, 853 A.2d 362 (2004) (emphasis in original) (citation formatting provided). "The purpose of a civil contempt proceeding is remedial. Judicial sanctions are employed to coerce the defendant into compliance with the court's order, and in some instances, to compensate the complainant for the losses sustained." **Stahl v. Redcay**, 897 A.2d 478, 486 (Pa.Super. 2006) (citation omitted).

Appellant's first two issues are interrelated, and we address them together. Appellant contends that the consent order was definite, clear, and specific about the performance required of Amres. Despite the fact that the consent order states that Amres would instruct the warehouse lenders to release the collateral files, Appellant asserts that the parties intended to transfer ownership of the loans to Nextres and a critical component of that sale was the release of the collateral files, and that Amres would not be in compliance if all it did was merely give an instruction to the warehouse lenders. Appellant claims that one of the parties needed to undertake the responsibility of having the lenders deliver the original notes to Appellant, and

- 6 -

the party who undertook that duty was Amres. Because the warehouse lenders refused to release the collateral files, Appellant asserts that Amres failed to comply with the consent order, which in turn resulted in cascading failures and inabilities to further comply with the order.[4] As a result, Appellant asserts that Amres' breach was the proximate cause of the closing not occurring, and constituted civil contempt of the consent order, and the trial court erred in denying Appellant's contempt petition. We disagree.

A consent order "is a contract which has been given judicial sanction, and, as such, it must be interpreted in accordance with the general principles governing the interpretation of all contracts." ***Com. ex rel. Kane v. UPMC***, 634 Pa. 97, 133-34, 129 A.3d 441, 463 (2015) (citation omitted). Contract interpretation is a question of law. ***Midwest Financial Acceptance Corp. v. Lopez***, 78 A.3d 614, 624 (Pa.Super. 2013).

> [W]hen interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple

---

[4] Appellant asserts that he was unable to review the original documents under paragraph 9, and that Amres could not perform its obligations under paragraph 10 (remedying deficiencies) or paragraph 15 (sending notice of transfer of ownership).

facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 983-84 (Pa.Super. 2023) (citation omitted).

Instantly, the consent order provided in relevant part:

7. On or before August 17, 2022:

a. the parties will execute Letters of Intent on the Sale Loans; and

b. upon Amres' receipt of the fully executed Letters of Intent, Amres will instruct the applicable warehouse lenders and/or custodian to release the collateral files to [Appellant] and/or [Nextres], including the original notes and mortgages, closing packages and executed assignments and allongers to [Nextres] which shall not be recorded until after the Closing Date.

(Consent Order, 8/8/22, at ¶ 7). The parties dispute the language "will instruct" as set forth in the consent order. According to Amres, it fulfilled the terms of the contract by instructing Churchill Bank to release the collateral

files to Appellant which, ultimately, Churchill Bank refused to do. Appellant, as discussed above, disagrees that the consent order imposed no further responsibility on Amres.

The trial court observed:

> [T]estimony from [Amres'] witnesses supported the conclusion that [Appellant's] interpretation of the Order was not substantiated by the facts. The Consent Order required [Amres] to "instruct" the applicable warehouse lenders to release the collateral files, which they did, and provide evidence of same at the Contempt Hearing. An email of a former Amres employee was introduced to demonstrate that he sent emails to the relevant warehouse lenders instructing them to release the collateral files. Examination of Caitlin P. Strauss, Esquire, counsel for Amres, further confirmed the efforts [Amres] made to comply with the Consent Order and the effort [Amres] felt they exerted to make the deal close beyond what was the minimum required under the Court Order. Ms. Strauss credibly testified to the effort which was put in by Amres and all counsel for Amres to complete the closing, despite the hiccups incurred along the way.
>
> *    *    *
>
> There was extensive testimony regarding the warehouse lender keeping the collateral [files] despite Amres' instruction to the contrary over the four days of the Contempt Hearings. There were several solutions offered so that Amres and [Appellant] could close on this deal as required by the Consent Order, all of which [Appellant] chose not to do. It was apparent by September 2, 2022, that Churchill was not going to release the original collateral documents unless the loans were paid in full. [Appellant] testified that one way that the deal could have closed despite the warehouse lenders' reluctance to release the collateral would be to release the collateral to another warehouse lender, an alternative option which [Appellant] chose not to pursue. Additionally, [Appellant] admitted that even without the collateral, this deal could have closed in

mid-March without the collateral, and they could buy the loans without the collateral now (six months after the Closing Date).[8]

> [8] This bolsters Wilson's testimony as credible on this issue that there are times in similar transactions where the money is actually released prior to the collateral documents being released, and therefore the transaction could have been completed by September 15, 2022.

This admission further contradicted any assertion that [Appellant] could not make the deal close on the Closing Date as he admitted it was possible, just not preferable to him, to have the collateral documents in hand before payment is made.

(Trial Court Opinion, 12/11/23, at 16-18) (internal citations omitted).

The record supports the trial court's interpretation of the consent order. The terms of the consent order are not ambiguous, and accordingly, we look at the plain meaning of the word "instruct." *See Riverview Carpet & Flooring, Inc., supra*. The plain meaning of "instruct" is "to give an order or command to." (*See* Merriam-Webster.com, Dictionary, Merriam-Webster, https://www.merriamwebster.com/dictionary/instruct (Last Accessed September 24, 2024)). As the trial court explained, Amres fulfilled this definition of "instruct." Appellant's interpretation of the consent order—that Amres was not only required to order or direct Churchill Bank to release the collateral files, but to ensure that Churchill Bank **provided** the files—goes far beyond the plain meaning of the word "instruct."

Further, the record supports the trial court's conclusion that Amres did not violate the consent order. Ms. Strauss testified that Amres sent emails to

Churchill Bank requesting the release of the specified documents to Appellant, but that, because Churchill Bank did not trust Appellant after prior litigation, it was reluctant to release the original documents. (*See* N.T., 3/1/23, at 12-13). Ms. Strauss subsequently emailed Appellant's counsel in an attempt to receive the name of Appellant's lender, lender counsel, and name of custodian, but this information was not provided. (*See id.*) Ms. Strauss then suggested that Appellant provide this email to Churchill Bank's general counsel but, as far as she was aware, Appellant never did so. (*Id.*) Based on the above, we agree with the trial court that Amres complied with the terms of the consent order. *See Riverview Carpet & Flooring, Inc., supra*. *See also Rogowski, supra*; *MacDougall, supra*. Therefore, Appellant's first and second issues merit no relief.

In Appellant's third issue, he contends that Amres failed to prove that Appellant was in civil contempt of the consent order. According to Appellant, Amres' failure to satisfy the condition of causing the warehouse lender to deliver original notes excused any requirement for performance by Appellant. Further, Appellant asserts that he cannot be liable for violating the consent order when the failure to close under the consent order resulted from the conduct of a third party. Finally, Appellant claims that his duties under the consent order were, at best, ambiguous. Appellant questions how he was required to close on the sale loans when the critical condition of closing had not occurred by the closing date, and Amres would be unable to transfer ownership. Appellant insists that the consent order did not provide for an

alternative solution, and that any suggested alternative solution was mere speculation. Appellant concludes that the court erred in finding him in contempt on these grounds, and this Court must grant relief. We disagree.

Instantly, the trial court observed:

This [c]ourt found by a preponderance of the evidence that [Appellant] acted with wrongful intent when [Appellant] intentionally failed to attend the settlement in violation of the terms of the Consent Order.

[Appellant] had notice of the terms through his counsel of the specific order which was disobeyed, as both parties attended the mediation and negotiated the terms leading to the stipulated Consent Order, which they both signed, and which was approved by this Court as an Order on August [11], 2022. [Appellant] made it clear that this violation was voluntary, as he testified he considered solutions to ensure the parties closed on the Sale Loans, but opted not to pursue those solutions. Rather, he continued acting in a manner which made it clear to this [c]ourt that he had no intention to follow through with the closing of these loans as required by the Consent Order. The [c]ourt determined that the testimony at the hearings regarding [Appellant's] actions during the period of August 8, 2022, through September 15, 2022 supported a finding that [Appellant] acted with wrongful intent during this time. The Order, as [Appellant] concedes, is definite, clear, and specific, leaving no doubt as to the prohibited conduct.

Furthermore, [Appellant] cannot rely on the phrase "delinquent 60+ days" as being unclear. Nick Ranieri, a former staff attorney and VP of compliance for Amres, testified as to his understanding of what the phrase "delinquent 60+ days" meant. Amres' CFO, Nacy Whipp[,] also testified to her understanding of what the phrase "delinquent 60+ days[" meant,] and indicated that funds related to taxes and insurance are not included in the phrase "delinquent 60+ days" in the industry. [Appellant's] testimony regarding the industry meaning of the term "delinquent 60+ days" was not found credible by this [c]ourt

> while the testimony of Wilson, Ranieri, and Whipp was credible.
>
> [Appellant's] predetermined intention to disregard the Consent Order provisions can be found further through his objections to loans which were less than 60 days delinquent at the time of closing, including loans which had become delinquent as recent as two weeks prior to the Closing Date. [Appellant's] intention to not close the deal despite the Court Order was further apparent by his inclusion of five loans on his written "Deficiency Notice" which were not 60+ days delinquent under any interpretation of the Consent Order.

(Trial Court Opinion at 15-18) (internal citations omitted). The trial court also noted that there was extensive testimony regarding the warehouse lender's discomfort with the release of the original documents unless Appellant paid the loans in full. (*See id.* at 17). Specifically, the court explained that Appellant was aware of several other avenues through which he could have closed the deal and did not pursue them. (*Id.*) The trial court viewed all of this evidence as supporting its finding that Appellant willfully, intentionally, and purposefully violated the consent order. (*Id.* at 18).

The record supports the trial court's conclusion that Appellant was in contempt of the consent order. Appellant had notice of the order and dates required for performance through the settlement conference; he willfully disregarded the order by refusing to consider other options that would have allowed Churchill Bank to release the original documents, and ultimately by failing to attend the required settlement conference; and he had a wrongful, or "predetermined" intention to disregard the provisions. *See Gunther, supra*. On this record, we see no error of law or abuse of discretion in the

court's finding of Appellant's contempt. ***See MacDougall, supra***. Appellant's third issue therefore merits no relief.

In Appellant's fourth issue, he contends that the court erred by denying his motion for contempt with prejudice. According to Appellant, the trial court did not specify the reasons for its denial of his motion, and the effect of the order is to "broadly deny Appellant relief under the consent order" as well as the May 19th order.[5] Importantly, however, Appellant has failed to preserve this issue in his six-page Rule 1925(b) statement. Thus, it is waived on appeal. ***See Tucker, supra*** (reiterating that issues not raised in Rule 1925(b) statement are waived on appeal).

In his final issue, Appellant challenges the court's imposition of sanctions. Appellant first contends that the sanctions order impermissibly omits a purge condition for remission of the $10,000 fine that was payable to the court. Appellant suggests such purge conditions are required in civil contempt proceedings, unless no fine or punishment is imposed.

Second, Appellant argues that the legal bills presented in support of Amres' actual loss were inadmissible hearsay. According to Appellant, Amres did not attempt to qualify the legal bills as business records of the applicable law firms, and could not do so, because they produced no witnesses to testify to the preparation and maintenance of the records of the law firms. Appellant

_____

[5] Appellant refers to the order dated May 19, 2022, and docketed May 20, 2022, which ordered the parties to participate in mediation and to comply with the terms of the redemption agreement.

argues that the testimony of Mark Wilson, Amres' principal, was insufficient to qualify as a custodian such that the information could be admitted under the business records exception.

Third, Appellant asserts that Amres' evidence included costs unrelated to the contempt, because it listed legal services that predated the "occurrence" of the contempt on September 15, 2022, when the closing did not occur. Appellant insists that the actual loss incurred, *i.e.*, loss directly related to the contempt, is $78,561.55.

Finally, Appellant maintains that the imposition of $90,000 for costs and attorneys' fees is a violation of the Eighth Amendment of the United States Constitution, as it is grossly disproportionate to the nature of the contempt. For the following reasons, we agree that relief is due.

We initially address Appellant's complaint about the fine imposed without a purge condition. Whether a fine imposed for a contempt violation is permissible depends on the court's "dominant purpose." ***Gunther, supra*** at 1016. "The proper classification of a contempt adjudication is important because it governs the procedures that must be followed. If the adjudication is criminal, then the contemnor is entitled to all of the procedural rights and safeguards afforded to criminal defendants, including the right to a trial by jury." ***Id.*** "In the most basic terms, if the dominant purpose is to coerce the contemnor to comply with a court order, it is civil; if the dominant purpose is to punish the contemnor for a past violation, it is criminal." ***Id.***

The typical sanction for civil contempt is remedial in nature.

> For example, a court may require the contemnor to compensate the opposing party for losses incurred as a result of the violation or reimburse the party's attorneys' fees and costs. It is also common in civil contempt for a court to impose a conditional prison sentence, giving the contemnor an opportunity to purge the contempt and avoid the sentence by compensating the opposing party, paying counsel fees, or doing some other affirmative act within a certain time period.

> \* \* \*

> In civil contempt, the contemnor is able to purge himself of the contempt and thus holds the key to the jailhouse door; that is, he may relieve himself of the sanction by complying with the court's order. In criminal contempt, [on the other hand,] the contemnor is punished with a fixed term of imprisonment or fine that he is powerless to escape by compliance[.] …

> … The purpose of civil contempt is to compel performance of lawful orders, and in some instances, to compensate the complainant for the loss sustained. When contempt is civil, a court must impose conditions on the sentence so as to permit the contemnor to purge himself.

*Id.* at 1016, 1018-19 (citations and quotation marks omitted) (holding that although procedural indicia of civil contempt were present in case, sanction imposed was neither compensatory nor conditional; more significantly, order contained no provision allowing appellant to purge contempt; vacating and remanding for re-sanctioning).

In **Brocker v. Brocker**, 429 Pa. 513, 241 A.2d 336 (1968) (plurality), *cert. denied*, 393 U.S. 108, 189 S.Ct. 857, 21 L.Ed.2d 773 (1969), our Supreme Court explained:

> [I]t is clear that a [c]ourt can for present or past acts of misbehavior amounting to civil contempt impose an unconditional compensatory fine and/or a conditional fine

- 16 -

and imprisonment, and such fine may be payable to the United States or to the Commonwealth or to the county or to the individual who was injured.

\* \* \*

While a [c]ourt in a proceeding for civil contempt may impose the remedial punishment of a fine and make it Payable to an aggrieved litigant as compensation for the losses or damages he may have sustained by reason of the contumacious conduct of the offender, and may also conditionally commit the defendant to prison for civil contempt, the penalty of $25,000 in this case was (as we have seen) Payable to the County, and it was to be remitted if defendant purged himself of his contempt.

*Id.* at 519-20, 26, 241 A.2d at 339, 342 (emphasis added). **See also Diamond v. Diamond**, 715 A.2d 1190 (Pa.Super. 1998) (holding that fine imposed in contempt proceeding was both unconditional and payable to court; thus, this sanction was criminal instead of civil; explaining that if relief provided is fine, it is remedial when it is paid to complainant, and punitive when it is paid to court, though fine that would be payable to court is also remedial when defendant can avoid paying fine simply by performing affirmative act required by court's order).

Instantly, the trial court imposed a $10,000 fine as a sanction to be paid to the Bucks County Court of Common Pleas. The court rejected Appellant's arguments that a purge condition was required. In doing so, the trial court cited, *inter alia*, to **Brocker**, in support of its assertion that the court may impose an "unconditional compensatory fine and/or a conditional fine and imprisonment, and such fine may be payable to the United States or to the Commonwealth or to the county or to the individual who was injured." (Trial

Court Opinion at 9). In ***Brocker***, however, the Court stated that although the court may commit the defendant to prison or order a penalty payable to either an aggrieved litigant or the county, the penalty was to be **remitted**—*i.e.*, returned—if the defendant purged himself of the contempt. ***See Brocker, supra***. Thus, ***Brocker*** does not support the trial court's statements that a purge condition was not required in this case.

Here, it is undisputed that the court imposed a $10,000 fine to be paid to the court and did not include a purge condition for this sanction. These facts render this sanction criminal in nature, lacking the procedural safeguards due a criminal defendant. ***See Gunther, supra***; ***Diamond, supra***. Because the trial court erred in imposing this portion of the sanction, we vacate that portion of the court's order and remand for re-sanctioning.

Turning to Appellant's remaining claims about the imposition of attorneys' fees, we note that in civil contempt matters, the court may impose sanctions "to compel or coerce obedience to a court order and/or to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance with a court order." ***Mrozek v. James***, 780 A.2d 670, 674 (Pa.Super. 2001).

> Attorneys' fees and other disbursements necessitated by the contemnor's noncompliance may be recovered by the aggrieved party in a civil contempt case. Because an award of counsel fees is intended to reimburse an innocent litigant for expenses made necessary by the conduct of an opponent, it is coercive and compensatory, and not punitive. Counsel fees are a proper element of a civil contempt order. In reviewing a grant of attorney's fees, we will not disturb

the decision below absent a clear abuse of discretion.

***Wood v. Geisenhemer-Shaulis***, 827 A.2d 1204, 1208 (Pa.Super. 2003)

(citation omitted).

This Court has explained:

> What is a fair and reasonable fee is sometimes a delicate, and at times a difficult question. The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was "created" by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question. A larger fee than usual is likewise frequently awarded when an attorney "creates" a fund.
>
> **By now it is hornbook law that the reasonableness of the fee is a matter for the sound discretion of the lower [c]ourt and will be changed by an appellate Court only when there is a clear abuse of discretion.**

> ***In re LaRocca's Trust Estate***, 431 Pa. 542, 246 A.2d 337, 339 (1968) (citations and footnote omitted) (emphasis added).

This Court has further explained:

> We have a limited power of review of court awarded fees. As the Supreme Court has so frequently stated, the responsibility for setting such fees lies primarily with the trial court and we have the power to reverse its exercise of discretion only where there is plain error. Plain error is found where the award is based

> either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award. The rationale behind this limited scope of review is sound. **It is the trial court that has the best opportunity to judge the attorney's skills, the effort that was required and actually put forth in the matter at hand, and the value of that effort at the time and place involved.**
>
> ***Gilmore by Gilmore v. Dondero***, [582 A.2d 1106, 1108-09 (Pa.Super.] 1990) (citations omitted) (emphasis added).
>
> … [T]he burden is on the claimant to justify a fee request.

***Carmen Enterprises, Inc. v. Murpenter, LLC***, 185 A.3d 380, 389-90 (Pa.Super. 2018), *appeal denied*, 650 Pa. 671, 201 A.3d 725 (2019) (emphasis in original). The attorney may provide an affidavit "describing his experience, expertise, and fee awards" in similar matters as well as "affidavits from other attorneys with commensurate experience" in such litigation and "bar surveys, all of which are regarded as competent evidence of a prevailing rate." ***Richards v. Ameriprise Fin., Inc.***, 317 A.3d 854, 870 (Pa.Super. 2019).

Additionally, the following principles apply to this Court's review of a challenge to the admissibility of evidence:

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. To constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining.
>
> Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more

- 20 -

or less probable or supports a reasonable inference or presumption regarding a material fact.

Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice.

Unfair prejudice supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially.  The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function.

*Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 639 (Pa.Super. 2019) (internal citations and quotation marks omitted).

"'[H]earsay' is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted." *Adams v. Rising Sun Medical Center*, 257 A.3d 26, 35 (Pa.Super. 2020), *appeal denied*, ___ Pa. ___, 263 A.3d 246 (2021).  "Generally, hearsay is inadmissible because it is deemed untrustworthy since it was not given under oath and subject to cross-examination." *Id.*  Nevertheless, the Pennsylvania Rules of Evidence provide an exception to the general rule prohibiting hearsay for certain types of business records:

**Rule 803. Exceptions to the Rule Against Hearsay—Regardless of Whether the Declarant is Available as a Witness**

\* \* \*

**(6) Records of a Regularly Conducted Activity.**  A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by—or from

information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). "In regard to the business records exception, the circumstantial trustworthiness arises from the regularity with which business records are kept and the reliance that businesses place on the accuracy of those records." *Bayview Loan Servicing LLC v. Wicker*, 651 Pa. 545, 560, 206 A.3d 474, 483 (2019).

This exception has been incorporated into Pennsylvania law through the Uniform Business Records as Evidence Act ("the Act"), which states:

A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S.A. § 6108(b). "The Act and the Rule substantially overlap in that both generally require that a custodian or other qualified witness testify that

the record was made 'at or near the time' of the event recorded and that the record was kept in the regular course of business." ***Bayview Loan Servicing, supra*** at 560, 206 A.3d at 483 (internal footnote omitted).

Regarding the requirement of testimony from a custodian or qualified witness, our Supreme Court has recognized:

> Quite often different individuals have personal knowledge of the various phases of a transaction so that no one individual has knowledge of the entire transaction. In addition, the frequent turnover of personnel often makes it impossible to identify the employee—if it were only one—who took part in the transaction. Under these circumstances, to require the entrant to have personal knowledge of the event recorded, and to require proof of the identity of the recorder, would exclude almost all evidence concerning the activities of large business organizations—a result diametrically opposed to the purpose and spirit of the Business Records as Evidence Act.

***Id.*** at 561, 206 A.3d at 483-84 (quoting ***Fauceglia v. Harry***, 409 Pa. 155, 158-59, 185 A.2d 598, 600 (1962)). "While a qualified witness need not have personal knowledge, the individual must be able to 'provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness…'" ***Carlini, supra*** at 641 (quoting ***Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.***, 77 A.3d 1, 13 (Pa.Super. 2013)). Thus, "the import of the Act is to require that the basic integrity of the record-keeping is established," and "as long as someone in the organization has personally observed the event recorded, the evidence should be admitted." ***Bayview Loan Servicing, supra*** at 562, 206 A.3d at 484 (internal quotation marks omitted).

Instantly, in support of its claim for attorneys' fees, Amres submitted redacted bills and invoices from its prior law firms and current counsel in the form of an affidavit. (*See* N.T. Sanctions Hearing, 10/4/23, at 16-17). Further, instead of calling a witness from Amres' original law firm to authenticate the documents, Amres called Wilson, its principal, to testify regarding the bills which had been paid, arguing that this rendered them business records of its own corporation. (*See id.* at 18).

As previously mentioned, Appellant argues that there was no foundation for Wilson's testimony regarding the bills as business records of Amres, emphasizing that there was no testimony regarding Wilson's role at Amres which would provide him with knowledge relating to the preparation, maintenance, and receipt of bills and payment of expenses; there was no testimony that Wilson conferred with any recordkeeper at Amres who would have knowledge of that information; that there was no testimony to support that Wilson otherwise should have reason to know whether the legal bills were properly invoiced or paid; there was mixed testimony on whether Wilson knew if the bills were actually paid; there was no testimony regarding the mode of receipt, review, or preparation of the invoices; and that there was no testimony as to whether the bills were maintained by Amres or paid in the ordinary course of business at or near the time of the act, condition, or events described therein. Appellant also argues that as a result of the court's admission of this evidence, Appellant was not able to cross-examine anyone who had actually prepared the invoices, particularly where they were

redacted. We agree with these contentions.

Although documents may be authenticated by a custodian who did not prepare them, the qualified witness must still "provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness." **Carlini, supra** at 641. Additionally, so long as someone in the organization has **personally observed** the event recorded, the evidence should be admitted. **See Bayview Loan Servicing, supra**. Nevertheless, our review of the record confirms that Wilson's testimony failed to satisfy these criteria. Thus, we agree with Appellant that the trial court abused its discretion by allowing the admission of the bills and invoices without proper authentication. **See Carlini, supra**. Accordingly, we affirm the court's findings of civil contempt against Appellant, but we vacate the imposition of sanctions for the reasons stated herein and remand for a new evidentiary hearing on sanctions.[6] **See, e.g., Centennial Station Condo. Ass'n v. Schaefer Co. Builders**, 800 A.2d 379, 386 (Pa.Cmwlth. 2002) (remanding for new hearing where award of attorneys' fees was based upon improper admission of business records, and where trial court had imposed $10,000 flat award unsupported by evidence of costs actually incurred).[7]

---

[6] Based upon our disposition, we decline to address Appellant's remaining claims in issue five on appeal.

[7] Although opinions of the Commonwealth Court are not binding on this Court, we may rely on them for their persuasive value. **See In re Brown**, 30 A.3d 1200, 1204 n.2 (Pa.Super. 2011).

Order affirmed in part; vacated in part. Case remanded for further proceedings. Jurisdiction is relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/17/2024